800 A.2d 54

CARPENTER TECHNOLOGY CORPORATION, PLAINTIFF–RE-
SPONDENT, v. ADMIRAL INSURANCE COMPANY; AETNA
CASUALTY AND SURETY COMPANY; ALLSTATE INSUR-
ANCE COMPANY (AS SUCCESSOR IN INTEREST TO NORTH-
BROOK INSURANCE COMPANY); AMERICAN INSURANCE
COMPANY; HIGHLANDS INSURANCE COMPANY; INSUR-
ANCE COMPANY OF NORTH AMERICA; INTERNATIONAL
INSURANCE COMPANY; LEXINGTON INSURANCE COMPA-
NY; PACIFIC EMPLOYERS INSURANCE COMPANY; PENN-
SYLVANIA INSURANCE GUARANTY ASSOCIATION; UNITED
STATES FIRE INSURANCE COMPANY; EXECUTIVE RE IN-
DEMNITY, INC.; ALLIANZ INSURANCE COMPANY; FIRST
STATE INSURANCE COMPANY; ASSOCIATED INTERNA-
TIONAL INSURANCE COMPANY; INDEMNITY INSURANCE
COMPANY OF NORTH AMERICA; UNDERWRITERS AT
LLOYD'S, LONDON; AND LONDON MARKET COMPANIES,
INCLUDING: DOMINION INSURANCE COMPANY; EXCESS

INSURANCE COMPANY; HIGHLANDS INSURANCE COMPA-
NY; LONDON & EDINBURGH GENERAL INSURANCE COM-
PANY LIMITED; STRONGHOLD INSURANCE COMPANY
LIMITED AND TUREGUM INSURANCE COMPANY, DEFEN-
DANTS,NEW JERSEY PROPERTY–LIABILITY INSURANCE
GUARANTY ASSOCIATION, DEFENDANT–APPELLANT.

Argued September 24, 2001—Decided June 17, 2002.

506

*Mark M. Tallmadge* argued the cause for appellant (*Bressler, Amery & Ross* and *Susan L. Moreinis,* attorneys; *Mr. Tallmadge* and *Stephanie M. Hopkins,* on the briefs).

*Steven E. Speece,* a member of the Pennsylvania bar, argued the cause for respondent (*Brown & Connery,* attorneys; *Mr. Speece* and *Michael J. Vassalotti,* on the briefs).

*Paul G. Witko,* Deputy Attorney General, argued the cause for *amicus curiae,* Commissioner of Banking and Insurance (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

The State of New Jersey and the United States identified Carpenter Technology Corporation (Carpenter), a corporation with its principal place of business in Pennsylvania, as a potentially responsible party (PRP) for environmental contamination at four sites in New Jersey. In response, Carpenter commenced a declaratory judgment action in which it sought a declaration of coverage for the claims under multiple insurance policies issued by

defendant insurance companies. Three of Carpenter's insurers became insolvent and, as a result, the New Jersey Property–Liability Insurance Guaranty Association (NJPLIGA) and the Pennsylvania Property and Casualty Insurance Guaranty Association (PPCIGA) (formerly known as the Pennsylvania Insurance Guaranty Association (PIGA)) were added as defendants.

PPCIGA is the primarily-liable guaranty association because any entity that may recover from more than one insurance guaranty association shall seek recovery first from the association of the residence of the insured. *N.J.S.A.* 17:30A–12a. The issue in this appeal is the amount of credit to which NJPLIGA is entitled because of PPCIGA's primary liability. The trial court concluded that NJPLIGA is entitled to a credit per "covered claim" of $299,900, which represents the maximum statutory amount PPCIGA could tender Carpenter under Pennsylvania law. The Appellate Division rejected that conclusion, holding that NJPLIGA is entitled only to a credit for the amount PPCIGA actually paid Carpenter in settlement of each covered claim. We conclude that the Appellate Division's holding contravenes the Legislature's intent in creating New Jersey's insurance guaranty association. We therefore reverse.

I

In 1974, our Legislature enacted the New Jersey Property–Liability Insurance Guaranty Association Act, *N.J.S.A.* 17:30A–1 to –20(Act). The Act requires that all insurers in New Jersey, with limited exceptions, join NJPLIGA in order to transact business. *Railroad Roofing & Bldg. Supply Co. v. Financial Fire & Cas. Co.*, 85 *N.J.* 384, 389–90, 427 *A.*2d 66 (1981); *N.J.S.A.* 17:30A–6. NJPLIGA is obligated to assume the contractual obligations of an insolvent insurer and to pay certain claims up to the limit of the policyholder's contract, subject to a maximum liability of $300,000. *N.J.S.A.* 17:30A–8a(1). In order to fund those claims, the Act authorizes NJPLIGA to collect assessments from member insurers that are used to pay both "covered claims,"

*N.J.S.A.* 17:30A–5d, and the Association's costs and expenses, *N.J.S.A.* 17:30A–8a(3). Member insurers can seek to recoup the amount of the assessment from their insureds by adding a surcharge on policy premiums. *N.J.S.A.* 17:30A–16a.

In 1994, the New Jersey Department of Environmental Protection (NJDEP) and the United States Environmental Protection Agency (EPA) identified Carpenter, incorporated under the laws of Delaware with its principal place of business in Pennsylvania, as a PRP for property damage and environmental contamination at four sites in New Jersey, two sites in Pennsylvania, and one site in Maryland. At the time Carpenter filed its declaratory judgment action, Carpenter manufactured specialty steel products and operated manufacturing plants in Pennsylvania and New Jersey. According to Carpenter's complaint, the property damage at the four New Jersey sites was due to either the treatment or recycling of manufacturing by-products, or in the case of one site where Carpenter operated an underground facility for storing solvents, the damage resulted from the leakage of chemicals such as Trichloroethylene (TCE). TCE is commonly used in manufacturing to degrease machine parts. *Toxicological Profile for Trichloroethylene.* U.S. Public Health Service, U.S. Dep't of Health and Human Servs., Atlanta, GA 1993. TCE is "between a probable and possible human carcinogen." U.S. Environmental Protection Agency, 63 FR 34338 (June 24, 1998).

Carpenter maintained primary umbrella and excess comprehensive general liability insurance to cover liabilities resulting from its manufacturing operations. Under the terms of the policies, each insurer agreed to defend and indemnify Carpenter for all liabilities to third parties. The policies covered claims brought by state and federal agencies for environmental damage that Carpenter caused by discharging waste materials and by-products into the environment.

Like NJPLIGA, PPCIGA is a property-liability insurance guaranty association created by Pennsylvania statute to provide limited relief to policyholders and claimants in the event of insurance

company insolvencies. Under both the New Jersey and Pennsylvania statutory schemes, if a potential claimant can make a claim against either guaranty association, the claimant must seek recovery first from the guaranty association of the state in which it resides. *N.J.S.A.* 17:30A–12; 40 *Pa. Stat. Ann.* § 1701.503. NJPLIGA's maximum statutory limit per "covered claim" is $300,000. *N.J.S.A.* 17:30A–8. PPCIGA's maximum statutory limit per "covered claim" is $299,900. 40 *Pa. Stat. Ann.* § 1701.203.

In 1993, Carpenter filed a complaint seeking declaratory relief requiring its insurers to defend Carpenter in any litigation and to indemnify Carpenter for all past, present or future losses and expenses in accordance with the liability coverage for environmental clean-up and remediation of the four New Jersey sites. As discussed, at the time Carpenter filed suit, three of Carpenter's insurers were insolvent. Accordingly, Carpenter sought statutory benefits from PPCIGA and NJPLIGA pursuant to 40 *Penn. Stat. Ann.* § 991.1801 to 991.1820 and *N.J.S.A.* 17:30A–1 to –20 respectively.[1] Both PPCIGA and NJPLIGA denied Carpenter's claims for statutory benefits. Carpenter, PPCIGA, and NJPLIGA moved for summary judgment. Carpenter admitted it was a Pennsylvania resident for insurance guaranty association purposes.

The trial court granted partial summary judgment to NJPLIGA and determined that PPCIGA was the primary payor in respect of the four New Jersey sites. The court noted that because Carpenter's corporate residence was in Pennsylvania, Carpenter was not a New Jersey policyholder. The court also found that the premiums Carpenter paid to the insolvent insurers were used to calculate the assessments paid to PPCIGA and not NJPLIGA. Accordingly, NJPLIGA's liability to Carpenter, if any, would be secondary. Carpenter does not challenge that determination.

---

[1] In 1994, the Pennsylvania Legislature repealed its statutory scheme, 40 *Penn. Stat. Ann.* § 1701.101 to 1701.605, and replaced it with 40 *Penn. Stat. Ann.* § 991.1801 to 991.1820. For ease of use, we will refer to the current version of the Pennsylvania Act.

The trial court also determined that NJPLIGA's maximum obligation to Carpenter in respect of the New Jersey sites was equal to its maximum statutory limit of $300,000 per "covered claim." Further, the court determined that the $300,000 limit should be reduced by a credit attributable to PPCIGA's payment to Carpenter under *N.J.S.A.* 17:30A–12a, but did not determine the amount of the reduction. The trial court calculated Carpenter's past damages attributable to the New Jersey sites to be $20,289,864.

The parties engaged in settlement negotiations. NJPLIGA participated in but later withdrew from those negotiations. In 1997, Carpenter settled with PPCIGA. NJPLIGA subsequently moved for summary judgment seeking an order permitting it to set off the maximum statutory claim payable by PPCIGA against its liability to Carpenter on each "covered claim." The trial court granted the motion and ruled that NJPLIGA was entitled to a credit for each "covered claim" equal to PPCIGA's maximum statutory limit ($299,900). The court held that NJPLIGA's maximum "per covered claim" obligation to Carpenter was $300,000, less a credit for PPCIGA's $299,900 statutory limit, that is, $100 per claim. Subsequently, the trial court held that Carpenter was entitled to relief on sixty-five "covered claims." Consequently, the trial court entered judgment in favor of Carpenter against NJPLIGA in the amount of $6,500.

The Appellate Division affirmed in part and reversed in part. *Carpenter Tech. Corp. v. Admiral Ins. Co.,* 335 *N.J.Super.* 510, 517, 762 *A.*2d 1066 (2000). The court held that NJPLIGA is entitled to a credit only for the amounts actually received by Carpenter from PPCIGA. *Id.* at 516, 762 *A.*2d 1066. Because the settlement amount did not appear in the record, the court remanded the matter for a determination of the proper credit. *Ibid.* The Appellate Division also affirmed the trial court's determination of the number of "covered claims." *Id.* at 517, 762 *A.*2d 1066.

We granted certification, 167 *N.J.* 633, 772 *A.*2d 935 (2001), on the issue of the amount of credit to which NJPLIGA is entitled.

We also granted the motion of the Commissioner of Banking and Insurance for leave to appear as *amicus curiae.*

## II

The narrow issue in this appeal is whether Section 12a of the Act entitles NJPLIGA to a credit equal to the statutory maximum payable by PPCIGA or merely to a credit for the amount Carpenter actually recovered from PPCIGA.

## A

*N.J.S.A.* 17:30A–12, Priority of claim of associations in other states, provides:

a. *Any person having a covered claim which may be recovered from more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured* at the time of the insured event except that if it is a first party claim for damage to property with a permanent location, he [or she] shall seek recovery first from the association of the location of the property. Any recovery under this act shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent. However, if recovery is denied or deferred by the association, a person may proceed to recover from any other insurance guaranty association or its equivalent from which recovery may be legally sought.

b. Any person having a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his [or her] right under that other policy. An amount payable on a covered claim under P.L.1974, c. 17 (C. 17:30A–1 et seq.) shall be reduced by the amount of recovery under any such insurance policy.

[ (Emphasis added).]

As a general rule, "[a] statute should be interpreted in accordance with its plain meaning if it is clear and unambiguous on its face and admits of only one interpretation." *Franklin Tower One v. N.M.,* 157 *N.J.* 602, 613, 725 *A.*2d 1104 (1999). "A statute's meaning is not self-evident, however, where varying interpretations of the statute are plausible." *Bergen Commercial Bank v. Sisler,* 157 *N.J.* 188, 202, 723 *A.*2d 944 (1999) (citation omitted). Moreover, "[w]here a literal reading will lead to a result not in accord with the essential purpose and design of the act, the spirit

of the law will control its letter." *Aponte–Correa v. Allstate Ins. Co.*, 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000) (citation omitted). "To that end, 'words may be expanded or limited according to the manifest reason and obvious purpose of the law.'" *State v. Ochoa*, 314 *N.J.Super.* 168, 171–72, 714 *A.*2d 349 (App.Div.1998) (citations omitted). Stated simply, "it is not the words but the internal sense of the law that controls." *Roig v. Kelsey*, 135 *N.J.* 500, 516, 641 *A.*2d 248 (1994). See also *N.J.S.A.* 1:1–1 (stating that courts construe statutory words and phrases according to their generally accepted meaning unless that meaning is inconsistent with legislative intent). Accordingly, a court's "ultimate goal in construing a statute is to ensure that the Legislature's plan is effectuated." *Lettenmaier v. Lube Connection, Inc.*, 162 *N.J.* 134, 144, 741 *A.*2d 591 (1999) (citation omitted); *see also Jimenez v. Baglieri*, 152 *N.J.* 337, 351, 704 *A.*2d 1285 (1998) ("The inquiry in the ultimate analysis is to determine the true intention of the law[.]") Moreover, "[l]egislative intent may also be inferred on grounds of policy or reasonableness." *McCann v. Clerk of the City of Jersey City*, 338 *N.J.Super.* 509, 519, 770 *A.*2d 723 (App.Div.), *aff'd*, 167 *N.J.* 311, 771 *A.*2d 1123 (2001) (citation omitted).

A simple reading of Section 12a demonstrates that its meaning is not plain. The first sentence states that a claimant "shall seek recovery first from the association of the place of residence of the insured." *N.J.S.A.* 17:30A–12a. As a matter of plain language, as well as common sense, "recovery" implies all available recovery. The next sentence states recovery in New Jersey shall be reduced by "the amount of recovery from any other insurance guaranty association or its equivalent." *Ibid.* That sentence blurs, but does not alter, the meaning of the first sentence, given what we perceive to be the Legislature's intent and this State's public policy, both discussed more fully below.

Stated differently, the statute read as a whole, particularly the initial sentence of Section 12a, establishes a principle of primary liability whereby the guaranty association located in the state of the insured's corporate residence is primarily liable. Residence is

the standard by which the statute determines the priority of liability. The language "amount of recovery from" is ambiguous in that context. We are persuaded therefore that "varying interpretations of the statute are plausible." *Sisler, supra,* 157 *N.J.* at 202, 723 *A.*2d 944.

The Supreme Court of Nevada, construing similar language in the Nevada guaranty association act, observed that the term "shall be reduced by the amount of recovery" is "neither a model of clarity nor an exemplar of the draftsman's craft." *Cimini v. Nevada Ins. Guar. Ass'n,* 112 *Nev.* 442, 915 *P.*2d 279, 282 (Nev. 1996). The *Cimini* court quoted the Arizona Supreme Court in *Arizona Property & Casualty Insurance Guaranty Fund v. Herder,* 156 *Ariz.* 203, 751 *P.*2d 519, 523 (Ariz.1988), wherein the Arizona court found ambiguous the phrase "[a]ny amount payable on a covered claim *shall be reduced by the amount of such recovery* under other applicable insurance" in Arizona's insurance guaranty association act. (Emphasis added).

■ Because different interpretations of the statute are arguable, we are obligated to look beyond its language, to discover the "spirit of the law." *Storch v. Sauerhoff,* 334 *N.J.Super.* 226, 229, 757 *A.*2d 836 (Ch.Div.2000) (citing *Ochoa, supra,* 314 *N.J.Super.* at 172, 714 *A.*2d 349).

B

■ Mindful of our duty to discern the legislative intent, we examine the Act's goals. The Act was created to "avoid financial loss to claimants or policyholders because of the insolvency of insurance companies." See *Senate Bill Statement,* S. 1004, c. 17 (April 11, 1974). Thus, the Act's function is twofold: to avoid "excessive delay," and to avoid "financial loss to claimants or policyholders." *N.J.S.A.* 17:30A–2; *New Jersey Prop.–Liab. Ins. Guar. Ass'n v. Sheeran,* 137 *N.J.Super.* 345, 351, 349 *A.*2d 92 (App.Div.1975). However, no legislative history exists in respect of the language in Section 12a stating that "[a]ny recovery under

this act shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent."

The principle of primary liability as set forth in Section 12a tracks the language of the Post–Assessment Property and Liability Insurance Guaranty Association Model Act (Model Act) drafted by the National Association of Insurance Commissioners (NAIC). A significant majority of states, including New Jersey and Pennsylvania, has passed some version of the Model Act containing the provision at issue in the present case. NAIC's purpose in passing the Model Act was to "minimize financial loss to claimants or policyholders because of the insolvency of an insurer." Post–Assessment Prop. & Liab. Ins. Guar. Assoc. Model Act, *reprinted in NAIC Model Laws, Regulations and Guidelines*, at 540–1, § 2 (1995).

In passing New Jersey's Act, the Legislature sought to bring our State within a nationwide network of individual insurance guaranty association statutes designed to spread equitably the risk of insurer insolvency among the states. See generally *American Employers' Insurance Co. v. Elf Atochem North America, Inc.*, 157 *N.J.* 580, 598, 725 *A.2d* 1093 (1999); T.B. Ridgley, *Interstate Conflicts and Cooperation, Law and Practice of Insurance Company Insolvency* at 528 (1986). The network *"should result in [an] as equitable as possible allocation of the inevitable loss* where 'everyone makes some concessions to the common necessity and *no one suffers too much.'"* See Christopher J. Wilcox, *The U.S. Guaranty Association Concept at 25: A Quarter Century Assessment*, 14 *J. Ins. Reg.* 370, 399 (1999) (citing *The Committee Comment to Wisconsin Statute Chapter* 645, at 377–78 (1967)) (emphasis added).

■ However, the legislative desire to assist claimants cannot be, and is not intended to be, bureaucratic benevolence. The Legislature did not give NJPLIGA unfettered discretion to accommodate all claimants for any claims. The conservation of resources is a major goal. The Legislature signaled the need for restraint and caution in the payment of claims, and did so in a

myriad of ways. Illustratively, NJPLIGA does not pay prejudg-
ment interest on covered claims. *N.J.S.A.* 17:30A–5d. It is not
liable for counsel fees incurred by a successful party in a declara-
tory judgment coverage action against NJPLIGA. *N.J.S.A.*
17:30A–5d; *New Jersey Guar. Ass'n v. Ciani,* 242 *N.J.Super.* 164,
169, 576 *A.*2d 300 (App.Div.1990). The Act specifically excludes
insurer subrogation claims from the definition of a covered claim.
*N.J.S.A.* 17:30A–5d. Recovery against NJPLIGA is limited to
unpaid claims that are either asserted by insureds or claimants
who are residents of the State, or concern property permanently
located in New Jersey. *N.J.S.A.* 17:30A–5. NJPLIGA is not
responsible for "assessments or charges for failure of [the] insol-
vent insurer to have expeditiously settled claims." *N.J.S.A.*
17:30A–5d. Further, where a claim is covered both by a solvent
insurer's policy and an insolvent insurer's policy, a policyholder
first must exhaust his or her policy with the solvent insurer before
NJPLIGA has any statutory obligation to pay the policyholder.
"Therefore, until such exhaustion[,] [NJPLIGA], as the 'deemed'
insurer under the insolvent insurer's policy, has no obligation."
*N.J.S.A.* 17:30A–12b; *Harrow Stores, Inc. v. Hanover Ins. Co.,*
315 *N.J.Super.* 547, 555, 719 *A.*2d 196 (App.Div.1998). Finally, the
Act's limitation of recovery at $300,000 per covered claim applies
regardless of whether a claimant's policy limit exceeds that
amount. *N.J.S.A.* 17:30A–8a(1).

This Court has recognized the legislative intent that conserva-
tion of NJPLIGA's resources is necessary to achieve the Act's
stated goals. In *American Employers', supra,* at issue was
whether the defendant was a New Jersey resident at the time of
the insured event. 157 *N.J.* at 590, 725 *A.*2d 1093. In holding
that the defendant was not a New Jersey resident under the Act,
we noted that "an overly broad definition of 'resident' *might place
New Jersey at a disadvantage compared to other states*" by
allowing other states to escape responsibility for covered claims.
*Id.* at 594, 725 *A.*2d 1093 (emphasis added). We emphasized that
"[a]lthough the scope of relief under the Act is to be construed
liberally to effect its purposes [citation omitted], *clearly one*

concern of the Legislature is 'to conserve limited Association resources to better assure their availability to serve core purposes.'" *Id.* at 590, 725 *A.*2d 1093 (quoting *Ciani, supra,* 242 *N.J.Super.* at 169, 576 *A.*2d 300) (emphasis added).

We now consider caselaw relevant to our analysis of Section 12a.

## C

*UMC/Stamford, Inc. v. Allianz Underwriters Insurance Co.,* 276 *N.J.Super.* 52, 647 *A.*2d 182 (Law Div.1994), addressed whether an excess insurer was entitled to a credit for the amount actually paid by the primary insurer or for the limits of the primary insurers' policies. There, the plaintiff sought coverage for environmental pollution claims under primary and excess insurance policies. After the plaintiff settled with the primary insurers, a nonsettling insurer moved for disclosure of the settlement agreement. *Id.* at 56, 647 *A.*2d 182. In holding that the nonsettling insurer could not compel disclosure of the settlement terms, the court reasoned:

[A]n excess carrier is entitled to a credit, not from the primary carrier's settlement, but from the amount allocable to the primary under its policies. In other words, *the excess carrier is entitled to a credit for the full amount of the primary carrier's coverage before it is required to pay any cleanup expense.*

[*Id.* at 69, 647 *A.*2d 182 (emphasis added).]

The Third Circuit cited *UMC* with approval in *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Company,* 177 *F.*3d 210 (3d Cir.1999). In that case, the plaintiffs instituted an action against the defendant insurance company seeking a declaratory judgment requiring that the defendant indemnify the plaintiffs for environmental cleanup costs. *Id.* at 214. Specifically, the plaintiffs contended that because they had settled with their primary liability carriers for less than their policy limits, the excess liability insurer should not have been granted a credit equal to the amount of the relevant policy limits. *Id.* at 226. Accordingly, the plaintiffs argued that the excess liability carrier was entitled to a credit for only the amount of settlement between the plaintiffs and the primary carrier. *Id.* at 226–27. In holding that

the excess liability carrier was entitled to a credit equal to the full amount of the policy limits, the court endorsed *UMC's* reasoning:

[T]he *UMC* approach tracks 'a widely followed corollary to the doctrine that a settlement with a primary insurer exhausts the primary coverage.' Under this approach, the insured forfeits any right to coverage of any dollar difference between the settlement amount and the primary insurer's policy limits. The excess insurer cannot be made liable for any part of this difference because the excess insurer never agreed to pay for losses below a specified floor.... This rule prevents the insured from securing a double recovery.

[*Id.* at 227.]

*See also Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 *F.*3d 1440 (3d Cir.1996) (stating that settlement between insured and primary insurer will automatically permit excess insurer to credit equal to primary insurer's policy limit) (citing Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 13.04, at 575–77 (7th ed.1994)). *But see McMahon v. Caravan Refrigerated Cargo*, 406 *Pa.Super.* 303, 594 *A.*2d 349 (Pa.Sup.Ct. 1991), *alloc. denied*, 529 *Pa.* 621, 600 *A.*2d 538 (1991) (holding that the plaintiff-claimant was not required to obtain a final adjudication of his claim against another guaranty association before recovering from PPCIGA). *McMahon*, in interpreting an analogous provision of Pennsylvania's insurance guaranty act, determined that because the plaintiff's claim had been denied by the guaranty association of the insured's residence (Texas), the plaintiff had satisfied his requirement to "exhaust first his right of recovery from the association of the place of residence of the insured." 40 *Pa. Stat. Ann.* § 991–1817(a). *McMahon*, however, is distinguishable from the instant matter because the guaranty association of the insured, PPCIGA, has not denied Carpenter's claims, but in effect has acknowledged an obligation to Carpenter by settling with it for an undisclosed sum.

### D

A few jurisdictions have decided questions pertaining to insurance guaranty associations. Although the facts in those cases are not analogous to the facts in this appeal, and therefore provide only limited guidance, they are useful in our analysis. Specifically,

those cases demonstrate how the national network of insurance guaranty associations interacts to provide relief to claimants as well as to apportion equitably the risk among the guaranty associations. Moreover, in three of those cases the guaranty associations paid their statutory maximum obligation, suggesting, as noted below, that they paid their maximum because they recognized that was their obligation.

For example, in *Mosier v. Oklahoma Property and Casualty Insurance Guaranty Ass'n*, 890 *P*.2d 878, 879 (Okla.1994), the plaintiff filed a products liability suit against two manufacturers. The plaintiff settled with one manufacturer for $30,000 and with the other manufacturer for $270,000. The insurer for the second manufacturer became insolvent and the $270,000 settlement remained unpaid. Under Oklahoma law the plaintiff was required to seek recovery first from the Texas Guaranty Association (TGA), the insolvent insurer's home state guaranty association. *Ibid.* At the time, the maximum recoverable amount by the plaintiff from TGA was $100,000. *Id.* at 879 n. 1. The plaintiff and TGA settled the claim for $75,000. Thereafter, the plaintiff filed a claim against the Oklahoma Property and Casualty Insurance Guaranty Association (OPCIGA) seeking $150,000—the maximum recoverable under Oklahoma law.

The Oklahoma Court of Appeals determined that OPCIGA was entitled to offset its $150,000 obligation by TGA's statutory limit, $100,000, rather than the amount actually received by the plaintiff from TGA, $75,000. *Id.* at 879. Thus, the court "held that this amount [$150,000] must be reduced by the amount ... [TGA] could have been required to pay." *Ibid.* Because the TGA maximum was $100,000, OPCIGA's obligation "was reduced from $150,000 to $50,000." *Ibid.* OPCIGA sought review by the Oklahoma Supreme Court. Plaintiff did not and therefore the court did not review the appellate court's holding in respect of whether OPCIGA was entitled to offset its obligation to the plaintiff by TGA's statutory limit or the amount actually recovered by the plaintiff.

In *Palmer v. Montana Insurance Guaranty Ass'n*, 239 *Mont.* 78, 779 *P.*2d 61 (Mont.1989), the Supreme Court of Montana held that the Montana Insurance Guaranty Fund (MIGA) was entitled to offset its obligation to the plaintiff by the maximum amount recoverable by the plaintiff from the Idaho Insurance Guaranty Fund (IIGF), the primarily-liable insurance guaranty association. Pointedly, the court observed that MIGA "was not adopted as a form of reinsurance for every insurer who becomes insolvent. Rather, it is clear the Association was established to soften resulting hardship which may be encountered, under limited circumstances." *Id.* at 64. *See also Sifers v. General Marine Catering Co.*, 897 *F.*2d 1288 (5th Cir.1990) (holding that Louisiana Insurance Guaranty Association could offset its maximum obligation of $150,000 by $100,000 paid to plaintiff by Texas Guaranty Association, its statutory limit); *Cox. v. Minnesota Ins. Guar. Ass'n*, 508 *N.W.*2d 536 (Minn.Ct.App.1993) (holding Minnesota Insurance Guaranty Association had no obligation to pay plaintiff because amount plaintiff recovered from primarily-liable Florida Insurance Guaranty Association—the statutory limit of $599,900— was greater than maximum recovery available in Minnesota— $299,900).

A constant in all of the above out-of-state cases is that the secondarily-liable guaranty association was credited the maximum amount recoverable from the primarily-liable guaranty association. We thus consider those cases to support the system of primary liability intended by the national network of guaranty associations.

## III

We hold that NJPLIGA is entitled to a credit equal to the statutory maximum amount payable by PPCIGA. Our decision comports with the Legislature's intent to enroll New Jersey in a national network of insurance guaranty associations designed to spread equitably the risk of insurer insolvency; our public policy favoring the protection of New Jersey insurance policy holders that fund NJPLIGA; the need to prevent claimants from bypass-

ing the system of primary liability codified in the Act; and the duty to conserve NJPLIGA's resources.

## A

We find persuasive NJPLIGA's argument that "[i]f a foreign corporation guaranty association and claimant can unilaterally decide the payment, if any, to be made by the primarily obligated guaranty association, then the mandate to seek recovery first from the state of residence *is subject to quick deals and cheap settlements, and is truly inoperable.*" (Emphasis added). The "plain meaning," if applied literally, can lead to absurd results. "[W]here a literal interpretation would create a manifestly absurd result, contrary to public policy, the spirit of the law should control." *Turner v. First Union Nat. Bank,* 162 *N.J.* 75, 84, 740 *A.*2d 1081 (1999). Illustratively, an insured and a primarily-liable guaranty association in another state could settle each of the insured's sixty-five claims for $1000 each, transferring the remaining obligation to NJPLIGA. Given NJPLIGA's cap of $300,000 per claim, under Carpenter's theory NJPLIGA would be obligated for the differential of $299,000 per claim on each of the sixty-five claims. As Judge Learned Hand observed, "[t]here is no surer way to misread any document than to read it literally[.]" *Guiseppi v. Walling,* 144 *F.*2d 608, 624 (2d Cir.1944), *aff'd sub nom., Gemsco, Inc. v. Walling,* 324 *U.S.* 244, 65 *S.Ct.* 605, 89 *L.Ed.* 921 (1945). If we were to adopt the Carpenter view, the primarily-liable guaranty association could settle for a small percentage of the claim, or even for "pennies on the dollar," evade its obligation as the primarily-liable association, and shift that primary obligation to the secondarily-liable guaranty association. That result stands the statute on its head. Neither the Model Act nor New Jersey law intended that the primarily-liable guaranty association could forsake its obligation and transfer its responsibility to a second guaranty association. Those statutes do not contemplate a "pick and choose" policy.

Although we do not attribute bad faith to PPCIGA or Carpenter, the process and the result give pause. By settling with Carpenter, PPCIGA at some level agreed that it had an obligation to pay Carpenter for its covered claims. Accordingly, on this record, any conflict concerning the priority of obligation between two liable guaranty associations must resolve itself in favor of the rule of primary liability expressed in Section 12a. To hold otherwise would force NJPLIGA to assume liability beyond that intended by the Legislature.

Although we recognize that in *UMC* and the other cases cited above, *supra* at 515–518, 800 *A*.2d at 61–62 the excess insurer's policy with the insured contained exhaustion language, those cases are nevertheless helpful by way of analogy. Just as an excess insurer is obligated to pay only an amount above the primary insurer's limit, a secondarily-liable insurance guaranty association should be required to pay only an amount above the maximum recoverable from the primarily-liable guaranty association.

The dissent concludes that because Section 12a does not employ the term "exhaust," in contrast to Section 12b, which does use "exhaust," NJPLIGA is entitled to credit only the amount Carpenter actually received from PPCIGA for each covered claim. *Post* at 530, 800 *A*.2d at 69. "Exhaustion" is properly used in Section 12b because of the potential for solvent insurers. See *Jendrzejewski v. Allstste Ins. Co.*, 341 *N.J.Super.* 460, 462, 775 *A*.2d 583 (App.Div.2001), *certif. denied,* 170 *N.J.* 209, 785 *A*.2d 437 (2001) (quoting *Jendrzejewski v. Allstate Ins. Co.*, No. L–9374–99, slip op. at 2 (Jan. 21, 2000) (holding that PIP coverage under defendant's policy must be exhausted before plaintiff could recover statutory benefits from PLIGA and that PLIGA assumes obligations of insolvent insurer)). In other words, Section 12b presumes the existence of solvent insurance and imposes no obligation on the guaranty association before that solvent insurance is depleted. A parallel procedure in circumstances where Section 12a governs simply will not work because of the mutuality of obligation of each

guaranty association to the claimant. Thus, in the absence of such insurance, the Legislature has prescribed that a system of primary liability should control under Section 12a.

In its discussion of exhaustion the dissent also asserts that the national network of state insurance guaranty associations establishes only the "order" in which claimants must pursue recovery. We disagree. If the dissent's view is taken to its logical extreme, it inexorably follows that a claimant, for reasons good or ill, can make its initial claim against the foreign association, settle for a small sum, and then demand payment from NJPLIGA for the bulk of its claim. The claimant thus reverses the order of priority and effectively makes *NJPLIGA* primarily liable.

We recognize that the Pennsylvania maximum ($299,900) approximates the New Jersey cap ($300,000). One may therefore contend that our result frees NJPLIGA from virtually any liability—only $6,500, as determined by the trial court. But that result is fortuitous, attributable only to the fact that the statutory maximum in each state is nearly identical.[2] NJPLIGA's obligation would be substantially greater, if, for example, the primarily-liable guaranty association was from Colorado, whose statutory cap is $99,900, *Colo.Rev.Stat.* § 10-4-508 or Oklahoma, whose cap is $150,000, *Okla. Stat. tit.* 36, § 2007. In the case of Colorado, NJPLIGA's liability would be $200,100 per claim. In the Oklahoma example, NJPLIGA's liability would be $150,000 per claim.

The Appellate Division and the dissent consider the out-of-state guaranty association cases unpersuasive. See 335 *N.J.Super.* at 514–15, 762 *A.*2d 1066; *post* at 533–534, 800 *A.*2d at 71–72. However, those decisions reinforce the conclusion that the existence of a nationwide network of insurance guaranty associations is premised on a scheme of primary liability that is designed to spread equitably the risk of insurer insolvencies. The significant point to be gleaned from the arithmetical labyrinth in *Mosier,*

---

[2] We note that the current Pennsylvania statute provides a maximum recovery of $300,000. 40 *Pa. Stat. Ann.* § 991.1803(b)(1)(i)(B).

*supra,* 890 *P.*2d 878, is that the secondarily-liable guaranty association was entitled to offset its obligation by the maximum potential obligation owed by the primarily-liable guaranty association, rather than the amount the primary association paid. Further, in three of the cited cases the primarily-liable insurance guaranty association paid its statutory maximum obligation to the plaintiff. As the New Jersey Banking Commissioner argues, those cases suggest that primarily-liable guaranty associations paid their statutory maximum because they recognized their obligation to do so. A contrary practice would expose the national network to settlements disruptive to its primary objective.

Finally, Carpenter's and the dissent's interpretation of Section 12a may expose NJPLIGA to substantially increased liability that will be borne ultimately by New Jersey's insureds. As *amicus* notes, "[i]mposing that burden on New Jersey shifts the obligations from one state's guaranty association to another at the whim of the insured, and effectively undermines the . . . national network of guaranty associations." We do not believe the Legislature intended the Act to require New Jersey residents and corporations to finance the cleanup of environmental sites polluted by foreign corporations that can recover from another state's guaranty association. Moreover, adopting Carpenter's interpretation would encourage out-of-state insureds to seek recovery from NJPLIGA when such recovery is more properly the responsibility of another state's insurance guaranty association. In that regard, we accept NJPLIGA's representation that

> NJPLIGA is involved in numerous declaratory judgment actions involving foreign corporations who have elected to bring their insurance coverage lawsuits in New Jersey since it is perceived to be a policyholder friendly forum. As a result[,] NJPLIGA is repeatedly joined in litigation asserting that it bears liability to pay statutory benefits for foreign corporations, which benefits are properly payable by a primarily liable foreign insurance guaranty association.

The Act was not designed to be a panacea for all problems caused by insurance company insolvencies or to require NJPLIGA to assume all the obligations of an insolvent insurer. We agree with the Supreme Court of Montana's observation that the legislation creating guaranty associations "was not adopted as a form of

reinsurance for every insurer who becomes insolvent." *Palmer, supra,* 779 *P.*2d at 64. Caution is thus the byword, particularly in this appeal, where three of Carpenter's insurers became insolvent and NJPLIGA is facing numerous claims. NJPLIGA has a fiduciary obligation to member insurers and is "required to act as [a fiduciary]." *Evanston Ins. Co. v. Merin,* 598 *F.Supp.* 1290, 1313 (D.N.J.1984).

B

Carpenter asserted at oral argument that its interpretation of the statute is consistent with this State's strong public policy favoring the settlement of litigation. Although we support that policy, we cannot allow a settlement to undercut the clear legislative intent behind the Act. Carpenter was aware that NJPLIGA believed that it was entitled to a credit equal to the maximum amount payable by PPCIGA. Carpenter settled with PPCIGA and then turned to NJPLIGA to make up the difference. Carpenter assumed the risk inherent in such a settlement. In sum, nothing in the Act suggests that the Legislature intended NJPLIGA to assume liabilities resulting from environmental or any other damage caused by an out-of-state corporation when those liabilities are the primary obligation of another guaranty association that has received the benefit of assessments paid by the original insolvent insurers.

Faced as we are with both parties' invocations of public policy, we conclude that this State's public policy supports NJPLIGA's position. Further compounding the problem, "large carrier insolvencies are becoming more and more frequent" and affect a wide range of insurers, including those providing environmental insurance. J. Ernest Hartz, *State Insurance Guaranty Associations: The Time has Come to Establish Uniform Ground Rules—or Prepare for Federal Involvement in Insurance Insolvency,* 22 *Fall Brief* 20 (1992) (cited in *American Employers', supra,* 157 *N.J.* at 598, 725 *A.*2d 1093); National Conference of Insurance Guaranty Funds, *1993 Assessment and Financial Information* 6–

7 (1994); A.M. Best Co., *Special Report: Best's Insolvency Study* (1991). Consequently, the cost of supporting insurer insolvencies is on the rise. See Kent M. Forney, *Insurer Insolvencies and Guaranty Associations,* 43 *Drake L.Rev.* 813, 814–15 (1995) (noting that net loss to insurers, who fund associations through assessments, is ultimately passed on to policyholders or taxpayers).

The dissent's suggestion that our disposition limits the amount of monies available to remediate in-state environmental hazards does not consider the unique facts of this appeal. Although we do not know why the settlement with Pennsylvania occurred, the fact is that Carpenter settled for less than was available under Pennsylvania law. Further, the record does not inform us whether other resources are available, *i.e.,* federal and/or state funding sources for the remediation of polluted sites. See Comprehensive Environmental Response, Compensation, and Liability Act, 42 *U.S.C.A.* § 9601 to –9675 (West 2001); Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.25 (2001).

### IV

Carpenter may not recover from NJPLIGA the difference between the amount Carpenter recovered from PPCIGA and NJPLIGA's maximum recovery of $300,000 per covered claim. After settling with the primarily-liable insurance guaranty association, Carpenter now insists that NJPLIGA make up the difference, a result that could expose NJPLIGA to millions of dollars in potential liability. We believe that our Legislature did not intend such a result.

Based on our interpretation of *N.J.S.A.* 17:30A 12a, and on this record, we conclude that NJPLIGA is entitled to a credit equal to the statutory maximum amount payable by PPCIGA.

Reversed.

VERNIERO, J., dissenting.

I would affirm the judgment of the Appellate Division substantially for the reasons expressed in Judge Bilder's persuasive opinion. *Carpenter Tech. Corp. v. Admiral Ins. Co.*, 335 *N.J.Super.* 510, 762 *A.*2d 1066 (2000). Based on a straightforward analysis, the panel determined that when the Legislature used the phrase "reduced by the amount of recovery" in *N.J.S.A.* 17:30A–12a, it meant what it said, namely, that "NJPLIGA is entitled to credit only for the amounts actually received by plaintiff from [PPCIGA]." *Carpenter, supra,* 335 *N.J.Super.* at 516, 762 *A.*2d 1066. The majority has reached an opposite conclusion. The Court concludes that "reduced by the amount of recovery" means reduced by an amount "equal to the statutory maximum amount payable by PPCIGA." *Ante* at 520, 800 *A.*2d at 64.

Our sole task is to look at the statute's words and ascribe to them their plain meaning. The Court does otherwise. It ferrets out an ambiguity that, in my view, does not exist. In so doing, the Court advances a parochial interest, and it dilutes our State's role in a national system designed to counteract the problems created by insolvent insurers. The irony is that, under the guise of protecting New Jersey's interests, the Court's disposition limits the amount of insurance monies available to remediate the environmental damage to four New Jersey sites. Our land and water, more so than Pennsylvania's, are at risk in this case. Because I do not subscribe to the Court's approach or to the statutory interpretation on which it is based, I respectfully dissent.

I.

I begin my analysis, as I must, by reviewing the text of the New Jersey Property–Liability Insurance Guaranty Association Act, *N.J.S.A.* 17:30A–1 to –20 (Act), which provides in relevant part:

a. Any person having a covered claim which may be recovered from more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured at the time of the insured

event except that if it is a first party claim for damage to property with a permanent location, he shall seek recovery first from the association of the location of the property. Any recovery under this act shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent. However, if recovery is denied or deferred by the association, a person may proceed to recover from any other insurance guaranty association or its equivalent from which recovery may be legally sought.

b. Any person having a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under that other policy. An amount payable on a covered claim ... shall be reduced by the amount of recovery under any such insurance policy.

[*N.J.S.A.* 17:30A–12.]

In adopting that language, the Legislature declared its goal unequivocally:

The purpose of this act is to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay [in] payment, to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.

[*N.J.S.A.* 17:30A–2a.]

The statute generally tracks the Post–Assessment Property and Liability Insurance Guaranty Model Act (Model Act), which was drafted by the National Association of Insurance Commissioners "as a means of allocating the risk of insolvent insurers equitably among the several states." *American Employers' Ins. Co. v. Elf Atochem*, 157 *N.J.* 580, 587, 725 *A.*2d 1093 (1999). As written, the statute contains two differences from the Model Act. First, it eliminates the reference to workers' compensation. Second, the New Jersey Act provides that if a claimant is "denied or deferred" by the first guaranty association approached, the claimant "may proceed to recover from any other insurance guaranty association or its equivalent from which recovery may be legally sought." *N.J.S.A.* 17:30A–12a. By enacting a statute similar to the Model Act, New Jersey has joined the majority of states in establishing a national system to ameliorate the losses to insureds that result when property and liability carriers fail.

## II.

Against that statutory backdrop, we are called on to interpret the "amount of recovery" language found at *N.J.S.A.* 17:30A–12a. A preeminent principle of our jurisprudence is that a court should not presume that in enacting a statute the Legislature intended something other than what it expressed by way of its plain language. *State v. Wright,* 107 *N.J.* 488, 495, 527 *A.*2d 379 (1987). "A statute should be interpreted in accordance with its plain meaning if it is 'clear and unambiguous on its face and admits of only one interpretation.'" *Bd. of Educ. of Neptune v. Neptune Township Educ. Ass'n,* 144 *N.J.* 16, 25, 675 *A.*2d 611 (1996) (quoting *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982)). When a statute is clear, "we need delve no deeper than the act's literal terms to divine the Legislature's intent." *Butler, supra,* 89 *N.J.* at 226, 445 *A.*2d 399.

Equally well-established is the corollary principle that the judiciary enjoys no fiat to rewrite a plainly-written enactment of the Legislature. *State v. Afanador,* 134 *N.J.* 162, 171, 631 *A.*2d 946 (1993) ("Absent any explicit indications of special meanings, the words used in a statute carry their ordinary and well-understood meanings."). Applying those standards, the Appellate Division reached the only possible conclusion regarding the meaning of "reduced by the amount of recovery." Nothing about that phrase is unclear or ambiguous. It means that a NJPLIGA payment is to be reduced by the amount a claimant actually receives from the other guaranty association.

Unlike the majority, I do not believe that enforcement of the Act's literal language will lead to an absurd result. The exposure of the guaranty association of one state can be distinct from the exposure of a secondary association in a different state, based on differences in the laws of those jurisdictions and in the specific provisions of their respective statutes. Thus, I can foresee that an association of first resort could have defenses to some but not all of a claimant's claims, thus warranting less than the maximum allowable recovery. After a claimant has recovered from one

association and then approaches a second association, the set-off should be the sum that the claimant has received in the first state, not that state's statutory maximum.

The majority suggests that the "seek recovery first" language in *N.J.S.A.* 17:30A-12a, when read in concert with the "exhaust first" language in *N.J.S.A.* 17:30A-12b, evinces a Legislative desire to limit recovery in these circumstances. I disagree. The "exhaust first" language appears solely within the context of a person having a claim under a policy "other than a policy of an insolvent insurer[,]" *N.J.S.A.* 17:30A-12b, which is not the case here. When the Legislature has employed a term in one place in a statute and excluded it in another, the term should not be implied where excluded. *Higgins v. Pascack Valley Hosp.*, 158 *N.J.* 404, 419, 730 *A.*2d 327 (1999).

Policy exhaustion makes complete sense when private insurance is concerned. Without question, a claimant should be required to draw on sources of insurance for which premiums have been paid before tapping into a fund guaranteed or established by the State. *See* Kent M. Forney, *Insurer Insolvencies and Guaranty Associations,* 43 *Drake L.Rev.* 813, 825 (1995) ("This rule is a direct outgrowth of the philosophy underlying the [Model] Act that the guaranty association is to be the 'payer of last resort,' and other solvent insurers are not entitled to reduce their liability because of the insolvency."). In that regard, when the Legislature used "exhaust first" in one section of *N.J.S.A.* 17:30A-12 and not in the other, it intended to require exhaustion relative to other insurance carriers, not as between guaranty associations.

One state, Arizona, has adopted the majority's interpretation. It did so, however, by legislatively amending the Model Act to provide that a claimant "shall first *exhaust* coverage from the [guaranty] fund of the place of residence of the insured[.]" *Ariz. Rev.Stat. Ann.* § 20-673B (emphasis added). That language is distinct from the provision in the New Jersey Act. Its enactment in Arizona underscores that the Legislature, not the judiciary, is the appropriate body to effectuate the result reached here.

Additionally, the Court states that "[a]s a matter of plain language, as well as common sense, 'recovery' implies all available recovery." *Ante* at 513, 800 *A.*2d at 59. Not so. First, if the language of the Act is plain, then the Court should not "imply" any greater meaning to the word "recovery." Second, the Court's determination that recovery means "all available" recovery is contrary to the normal usage of that term. In our usual parlance, "recovery" means "[t]he amount finally collected, or the amount of judgment." *Black's Law Dictionary* 1147 (5th ed.1979). Parties often recover less than the amount sought in a dispute. In any event, for the reasons already stated, the Court's interpretation of "recovery" is belied by the Act's unambiguous text.

Similarly, I cannot agree with the majority's contention that the "seek recovery first" language of the Act makes the guaranty association of first resort the "primary" insurer and the remaining associations the "excess" insurers, with all of the implications of those terms. The guaranty associations of the several states do not fall into the primary-excess paradigm relative to each other because there is no exhaustion provision with respect to them. On the contrary, as noted, the secondary associations are treated as excess insurers only in connection with insurance policies other than those of an insolvent insurer. That is why the other insurance policies must be exhausted before a guaranty association can be approached. See *McMahon v. Caravan Refrigerated Cargo,* 406 *Pa.Super.* 303, 594 *A.*2d 349, 351 (Pa.Super.Ct.) (concluding that claimant need not obtain final adjudication of his rights against another state's insurance guaranty association as prerequisite to obtaining benefits from his home state's association), *appeal denied,* 529 *Pa.* 621, 600 *A.*2d 538 (1991).

If the Legislature did not intend the New Jersey association to fall into the primary-excess paradigm, then what purpose is served by having a claimant first seek recovery in a jurisdiction other than ours? The Act itself supplies the answer to that question. The Act directs a claimant to "seek recovery first from the association of the place of residence of the insured" or, in the case

of a first-party claim for property damage, "from the association of the location of the property." *N.J.S.A.* 17:30A–12a. I discern from that language that the Legislature intended to establish an orderly process by which every claimant would know in advance where and how to assert a claim.

Given that the Act serves as our link to a national claims system, that orderly process makes perfect sense. The Model Act establishes the same basic process. Significantly, the comment to the Model Act emphasizes that the claims process "does not prohibit recovery from more than one association, but it does describe the association to be approached first and then requires that any previous *recoveries* from like associations must be set off against *recoveries* from [another] association." Model Act § 12 cmt. (emphasis added). The comment's reference to recoveries rather than to maximum statutory limits lends further support to the Appellate Division's holding.

The Act also fosters one of the Legislature's stated aims, namely, "to avoid excessive delay [in] payment[.]" *N.J.S.A.* 17:30A–2a. Requiring claimants to assert claims first in their home jurisdictions, or in the state in which their property is located, reduces the costs of litigation and generally facilitates the prompt administration of claims. That requirement, however, does not on its face signal a legislative intent to limit NJPLIGA's obligation in the present circumstances.

### III.

The out-of-state cases cited by the majority do not, in my view, support the Court's disposition. In *Palmer v. Montana Insurance Guaranty Ass'n*, the issue was whether the coverage limit of the secondarily-liable Montana Insurance Guaranty Association (MIGA) could be "stacked" with the limit of the primarily-liable Idaho Association. 239 *Mont.* 78, 779 *P.*2d 61, 62 (Mont.1989). The claimant had already received Idaho's maximum statutory benefit ($300,000), and had argued successfully in the Montana District Court that the Idaho payment should be deducted from its

total unpaid claim, but not from Montana's statutory limit (which was also $300,000). *Id.* at 62–63. The *Palmer* claimant thus was attempting to obtain the full maximum statutory limit from each liable guaranty association.

The Montana Supreme Court rejected that attempt at double-recovery, stating: "The framers' comments to this offset provision of the Model Act support our conclusion that *payments* from another association are offset against the $300,000 limit of MIGA's obligation." *Id.* at 64 (emphasis added). Because the claimant in *Palmer* had received the statutory limit from Idaho, there was never any question about the credit to which the Montana association was entitled.

That same situation occurred in *Sifers v. General Marine Catering Co.*, 897 *F.*2d 1288 (5th Cir.1990). There, the claimant received the Texas Insurance Guaranty Association's statutory maximum amount ($100,000), thus eliminating any question about the amount of credit to which Louisiana was entitled. *Id.* at 1290. *Cox v. Minnesota Insurance Guaranty Ass'n* likewise involved a payment of the statutory maximum by the Florida Insurance Guaranty Association that exceeded the limits of the later-approached Minnesota Insurance Guaranty Association. 508 *N.W.*2d 536, 539 (Minn.Ct.App.1993). Thus, no issue regarding the meaning of "amount of recovery" was implicated in any of those cases. Lastly, in *Mosier v. Oklahoma Property & Casualty Insurance Guaranty Ass'n*, the Oklahoma Court of Appeals specifically declined to express an opinion on the question that is before us in this appeal. 890 *P.*2d 878, 881 n. 3 (Okla.1994).

IV.

As additional policy support for its disposition, the majority hints at potential collusion between a claimant and a foreign association by which the parties could engage in "*quick deals and cheap settlements* [.]" *Ante* at 521, 800 *A.*2d at 64. From the injured claimant's perspective, such collusion seems unlikely. For example, the total amount Carpenter can recover under the re-

spective guaranty statutes is the $300,000 cap per covered claim found in the New Jersey Act. See *Palmer, supra,* 239 *Mont.* 78, 779 *P.*2d 61; *Sifers, supra,* 897 *F.*2d 1288; *Cox, supra,* 508 *N.W.*2d 536. Under the Appellate Division's holding, the claimant's recovery is capped at the statutory maximum of the New Jersey Act, irrespective of the sum actually received from the other state's guaranty association. Thus, a claimant in Carpenter's position would have little incentive to shift liability from Pennsylvania to New Jersey because, in the end, the claimant would face the same limitation to recovery.

Moreover, if a foreign association unilaterally denies or defers coverage, the Act plainly permits a claimant to proceed against the New Jersey association regardless of the motives of the foreign association. *N.J.S.A.* 17:30A–12a. That rule underscores that the Act's primary objectives are to protect claimants to the fullest extent possible and to pay claims promptly. We should not, then, conjure up images of would-be conspirators to detract us from those central purposes. In any event, a claimant is better off obtaining as much money as possible from the foreign association first approached to eliminate the need for further litigation in this State.

The Legislature was well aware of that reality when it enacted the Act. Indeed, the Act expressly authorizes our New Jersey association to "[i]nvestigate claims brought against the association and adjust, compromise, *settle,* and pay covered claims to the extent of the association's obligation[.]" *N.J.S.A.* 17:30A–8a(4) (emphasis added). Given the large volume of civil cases, I doubt that the system could function properly without parties engaging in some form of compromise. One commentator has observed aptly that "[m]ost practitioners and academics consider it to be in the public interest to have disputes settled between parties without a judicial decision." Seth Nesin, *The Benefits of Applying Issue Preclusion to Interlocutory Judgments in Cases That Settle,* 76 *N.Y.U. L.Rev.* 874, 889 (2001). The Court needlessly raises the specter that cases in this area will be tried to their bitter

conclusions irrespective of the merits of the disputes or the public's interest in having litigants resolve their differences amicably.

Lastly, the majority posits that "a major goal" of the statute is "[t]he conservation of resources[.]" *Ante* at 515, 800 *A*.2d at 61. The majority overstates the significance of that aspect of the Act. The overarching aim of the Act is, as the Legislature itself declared, "to avoid financial loss to claimants or policyholders because of the insolvency of an insurer[.]" *N.J.S.A.* 17:30A-2. To be sure, our Legislature intended our resources to be husbanded by capping our fund's liability at $300,000 per claim and excluding certain claims and damages from the scope of recovery. *N.J.S.A.* 17:30A-8a(1); *N.J.S.A.* 17:30A-5(d). Those cost-containment methods, however, do not reflect any intention on the part of the Legislature to reduce the fund's obligation by sums never actually received by a claimant.

## V.

In sum, the Act's clear goal is to protect insureds as part of a national legislative pattern established to address the inequities and hardships caused by insurance company insolvencies. Interpreting the statute to advance New Jersey's parochial financial interest is at odds with that objective. In the last analysis, those financial interests are overstated when one considers that our true interest in this case is to fund an environmental clean-up plan for four New Jersey sites. Because that interest is not advanced by the majority's approach and for the other reasons stated, I would affirm the judgment of the Appellate Division.

*For reversal*—Chief Justice PORITZ and Justices STEIN, COLEMAN and ZAZZALI—4.

*For affirmance*—Justice VERNIERO.