271 N.J. Super. 459 (1994)
638 A.2d 1333
EMILY VENETSANOS, INDIVIDUALLY AND AS ASSIGNEE OF THE RIGHTS OF MANUEL DOMINGUEZ, PLAINTIFF-RESPONDENT,
v.
ZUCKER, FACHER & ZUCKER, AND ROGER C. WILSON, DEFENDANTS-RESPONDENTS, AND HOMESTEAD INSURANCE CO. AND WALTER KOLODY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 1993.
Decided March 4, 1994.
*461 Before Judges SHEBELL, LONG and LANDAU.
Robert E. Mensel argued the cause for appellants (Hanlon, Lavigne, Herzfeld & Rubin, attorneys; Mr. Mensel of counsel and on the brief).
E. Carter Corriston argued the cause for respondent (Breslin & Breslin, attorneys; Mr. Corriston, of counsel, and Lawrence Z. Farber, on the brief).
Francis B. Schultz argued the cause for respondents Roger Wilson and Zucker, Facher & Zucker (Stevens & Minter, attorneys; Mr. Schultz, on the brief).
The opinion of the court was delivered by LANDAU, J.A.D.
This is an appeal by defendants Homestead Insurance Company (Homestead) and Walter Kolody (Kolody) from a February 25, 1993 Law Division order granting summary judgment to plaintiff, Emily Venetsanos, and granting summary judgment for indemnification *462 against appellants in favor of defendants Zucker, Facher & Zucker (Zucker) and Roger Wilson, a Zucker attorney. Venetsanos brought the present action against the appealing defendants and against defendants-respondents both directly and as assignee of the rights of Manuel Dominguez.
After she was injured in a boat explosion, Venetsanos instituted a prior action against Manuel Dominguez and other defendants, alleging negligent operation and product defects. Zucker was retained by the insurer to represent Dominguez, who was insured under a $100,000 liability policy, nominally issued by The Mutual Fire, Marine and Inland Insurance Company (Mutual), a Pennsylvania company which later filed for bankruptcy protection. Mutual was authorized to do business in New Jersey. Homestead was not.
In 1987 Mutual entered rehabilitation proceedings pursuant to an order of the Pennsylvania Commonwealth Court. Homestead was a 100 percent reinsurer of Dominguez' policy with Mutual, pursuant to a reinsurance agreement which has not been found and cannot, therefore, be examined as to its terms. Homestead and the Pennsylvania rehabilitator have disagreed as to obligations under that agreement. A suit against Homestead has also been instituted in the Commonwealth Court of Pennsylvania by the Insurance Commissioner of Pennsylvania as rehabilitator of Mutual, which alleges that Homestead has failed to honor its reinsurance agreements with Mutual, including obligations under a "Boat and Property Program Agreement" which cannot be located in the files of Mutual. For reasons discussed below, we do not view those disputes to be pertinent in this case against Homestead, nor do we concede that exclusive jurisdiction in this particular dispute with Homestead and Kolody must lie in the Mutual liquidation proceedings in Pennsylvania under principles of comity, and the Uniform Insured Liquidation Act, N.J.S.A. 17:30C-1 to 31, as urged by appellants.
Following jury trial of the prior Venetsanos' action, judgment was entered jointly and severally against all defendants in the *463 amount of $960,000, plus prejudgment interest of $323,425. Dominguez' percentage of fault was fixed at 19 percent, making his share, inclusive of pre- and post-judgment interest as of June 16, 1993, approximately $315,000.
In 1988, Dominguez assigned his rights against Mutual and others to Venetsanos, whose subsequent action against Mutual was dismissed without prejudice because of its bankruptcy petition. The present action, as amended, was brought against Zucker, Wilson, Kolody and Homestead asserting prejudicial failure fully to inform Dominguez of Mutual's financial problems and its affect upon resolution of the case. The action also made a "Rova Farms"[1] claim against Homestead and Kolody, the independent claims agent used by Homestead, alleging failure to negotiate settlement of the underlying case in good faith within policy limits and failure to advise the insured of the extent of risk in excess of those limits. Although Zucker attempted to implead Mutual, that effort was unsuccessful because of the Pennsylvania rehabilitation proceedings.
Zucker and Venetsanos joined in a motion which sought summary judgment on the theory that Mutual had merely been "fronting" for Homestead in New Jersey and that, in consequence, Homestead should be regarded as the direct insurer rather than the reinsurer of Dominguez' boat policy. On October 28, 1992, the Law Division judge entered orders for summary judgment against both Homestead and Kolody, awarding damages to Venetsanos in the principal amount of $182,400 plus substantial pre- and post-judgment interest, and awarding to Zucker and Wilson summary judgment for indemnification against Homestead on Venetsanos' complaint. We affirm.

I.
The practice of reinsurance of risks by insurance companies with other companies is lawful and recognized in our statutes. *464 See, e.g., N.J.S.A. 17:18-5, and 17:18-9. For purposes of statutory adequacy of capital to cover exposure, however, risks are still considered part of the exposure of a New Jersey admitted insurer, unless reinsured with a company authorized to do business in New Jersey. N.J.S.A. 17:18-9.
In his oral opinion rendered on October 28, 1992, the motion judge found, upon review of the supporting and opposing summary judgment materials, that,
This insurance policy was underwritten by ... "Homestead". The policy, however, bore the name of .. . "Mutual". This was due to the fact that Homestead was not licensed to conduct business in New Jersey. Mutual's performance consisted of issuing and mailing checks at Homestead's request. Thereafter, Homestead would reimburse Mutual for funds disbursed plus expenses.
The judge also recited as part of the facts that Zucker and Wilson communicated on several occasions directly with Kolody, as an independent contractor hired by Homestead to adjust Dominguez' claim, strongly recommending settlement because it was likely that Dominguez' share of liability would exceed the $100,000 policy limit. Kolody, he found, had limited authority, and final decision-making power was retained by Martin Beitler, the president and C.E.O. of Homestead. Despite these recommendations and awareness of "potential Rova Farms liability", Homestead made no attempt to settle the claim.
The judge then determined that "Homestead was in control of the policy obtained by Manuel Dominguez[.] [A]lthough the policies bore the name of Mutual, Homestead actually did the insurance investigation, reimbursed Mutual for claims and had final authority on all settlements."
We note that Martin Beitler, president of Homestead at all times material hereto, testified at depositions on June 1, 1992 that when Kolody, who he said represented Mutual as a lawyer and as the adjuster, would get a demand to settle a case, "[h]e would go to us, Homestead." The following deposition extract is instructive:
Q. He didn't go to Mutual Fire because they weren't going to pay the claim, is that correct?

*465 A. Right.
Q. He would go to you?
A. That's right.
Q. Who would make the determination as to whether or not the claim should be paid?
A. Homestead would.
Although Beitler disclaimed specific recollection of whether Kolody consulted with him on Venetsanos' suit against Dominguez, he acknowledged that Kolody did not have authority to settle the claim without his approval, and that he (Beitler) would evaluate such claims and make the decision whether they should be paid. These consultations were conducted orally.
However, Beitler went on to testify that once Mutual went into the rehabilitation plan, approved June 26, 1987, the boat claims primarily insured by Mutual had to be approved by Mutual before they could be settled:
[b]ecause when the company is in rehabilitation, the accounting and the reinsurance is entirely different.... [T]he premiums that are paid to the Mutual Fire, in this particular case, belong to Mutual Fire. Any reinsurance belongs to all the creditors. We can't take reinsurance premiums and pay claims because we would then be preferring certain creditors.
Beitler also testified that Euclid Services Inc., an insurance brokerage company of which he was also president, had offices at 52 Duane Street where both Kolody and Homestead were located. Dominguez' boat insurance was written by Euclid Services, Inc. in conjunction with North American Boating Association, an entity acquired by Euclid Services, Inc. when it "made a deal to run that operation [a Bronx brokerage]." The same holding company apparently owns both Homestead and Euclid Services.
According to depositions of Kolody, Euclid Services was the "managing general agent" for Mutual. Depositions of a Homestead official, Charles Popall, also showed that the final decision as to whether Mutual would pay a claim was made by Beitler. "[H]e may tell Kolody or he may tell someone else, `Advise Mutual that this claim is to be paid.' But he definitely made the final decision." Homestead would then reimburse Mutual.
*466 The agent for service of process upon Mutual was listed in Dominguez' policy as "Martin Beitler, Esq." Beitler testified at depositions that the boat insurance was originally placed with North American Boating Association; that North American Boating Association was a name used by Euclid Services, Inc., the broker; that the broker earned and retained a 15 to 20 percent commission on boat insurance premiums, and then forwarded the premium balance to Mutual, which would send back 70 percent of the premium to Homestead. It was described this way by Beitler at his deposition:
Q. What would the agent then do with the premium that he had received?
A. Well, the set-up we had was we send the money to the Mutual Fire. Mutual Fire would either send it back to us or we would send it directly to Homestead, their portion of the premium.
Q. I just have to follow.
A. Let's say there was a $100 premium.
Q. Right. The agent gets the 
A. The agent got his commission, which I don't recall. I think it was either 15 or 20 percent commission.
Q. Yes.
A. He would send $80 to the Mutual Fire and Mutual Fire would take out $10, it would send back $70 to the Homestead Insurance Company.
Beitler explained, "[w]e usually paid them [Mutual] a 10 percent fee for the use of their policy and depending on the situation we would reinsure all or part of the exposure back into Homestead." It is undisputed that Homestead had the entire exposure for liability under the Dominguez policy.
Kolody testified at his deposition that he was an independent contractor but was vague as to who he was serving as adjuster in 1987. It appears that Euclid Services was the source of his compensation. Correspondence before the Court on the motion, however, showed that on July 22 and July 29, 1987, Wilson, for the Zucker firm, corresponded with "Homestead Insurance Co., Att: Mr. Walter Kolody, 52 Duane Street, New York, N.Y. 10007", respecting settlement of the Dominguez matter. The July 29 letter stated that it was not until July 27, 1987 that Zucker was first advised that the carrier was not Homestead, but Mutual, and *467 that Mutual was in rehabilitation. The Zucker letters advised Homestead, through Kolody, that there was a strong Rova Farms risk and recommended a substantial settlement offer.
The record shows that a letter was sent to Dominguez, the insured, dated April 29, 1985, on Homestead Insurance Company stationery which listed its "administrative (mailing) address" as 52 Duane Street, New York, NY 10007. The letter called attention to the fact that the Venetsanos claim exceeded the sum of $100,000 amount of his coverage. Mutual was not mentioned.
Nonetheless, a July 3, 1985, letter to Dominguez from the Zucker firm indicated that its retention to defend him in the Venetsanos matter was by Mutual. This was followed by a November 20, 1985 letter on Euclid Services stationery, with the 52 Duane Street address, written by Kolody to Dominguez, stating that Euclid Services was the managing general agent for Mutual.
As noted, correspondence in 1987 between the Zucker firm and Kolody was addressed to Homestead Insurance Company, Attn. Walter Kolody, at the same Duane Street address. A December 7, 1987, Zucker letter addressed to Kolody at Homestead referred to the ongoing settlement negotiations before the court on December 2, and said:
After discussing the above figures with you, you authorized a maximum contribution of 10% toward any settlement package; with the total package demand of $373,000, that would mean a maximum contribution from your Company of $37,300 which is nowhere near the recommended contribution of the Judge as set forth above. This will additionally confirm that the undersigned has recommended over the past several days of a minimum contribution from your Company in the area of $75,000 rendered toward the resolution of these cases. You have indicated that your Company is only interested in offering 10% of any total settlement figure....
The letter went on to strongly urge an increase from the $37,500, 10 percent, settlement contribution authorized after the December 2nd discussions to $75,000 or more, because of the overall exposure, Rova Farms liability, and prejudgment interest.
Popall, a Homestead official, testified that someone from "National Boat Plan [sic] ... would submit the risk to us, Homestead, and we would look it over and either approve it or tell him to *468 decline it. Now, once that was done we, Homestead, had policies from Mutual, and we issued the policy on Mutual Fire and Marine." This was done, he testified, because Homestead was not licensed in New Jersey, and so although it made the initial underwriting decision, and undertook the entire risk, it had to use Mutual as the "front". Although Homestead handled the claim (as exemplified by the 1985 letter from Popall to Dominguez), payments on claims had to be made by Mutual, and reimbursed by Homestead, "because it's against the law for Homestead to issue checks to another company's policy."
An April 29, 1992, affidavit by Beitler stated that Kolody acted only for Mutual in matters of management and settlement of the underlying Venetsanos-Dominguez suit. This was in conflict with Beitler's later deposition testimony, quoted above. Significantly, appellants' answer to Venetsanos' amended complaint also admitted that:
Defendant, Homestead Insurance Company through its agent, servant and/or employee Defendant, Walter Kolody was responsible for the negotiations and settlement of this matter in [sic] behalf of Mutual Fire, Marine and Inland Insurance Company.

II.
Appellants argue that New Jersey Courts lack jurisdiction under the Uniform Insurer's Liquidation Act, N.J.S.A. 17:30C-1 to -31, and under principles of comity, to adjudicate obligations between Homestead and Mutual, an insurer under rehabilitation in Pennsylvania. They also interpose more traditional arguments that the judge improperly undertook to resolve on a summary judgment motion factual issues as to whether Kolody was an employee and agent of Homestead; whether Homestead's practices in connection with the risk and the claim justify regarding it as the real primary insurer of Dominguez; and whether this was a "Rova Farms" case in which the Dominguez exposure could have been settled by tendering an amount up to the $100,000 policy limit.
*469 The key question is whether the judge properly determined, on the motion materials presented, that the technical veil of reinsurance should be pierced and that, for purposes of the present action, Homestead should be charged with the responsibilities of a primary insurer.
The following conclusions find support in the record. First, appellant's own pleadings admitted the allegation that Homestead was responsible for negotiating and settling the Venetsanos matter on behalf of Mutual through its agent or employee Walter Kolody. Second, the reinsurer, Homestead, was presided over by Martin Beitler, the same person who headed the brokerage (Euclid Services) through which the North American Boating risks were placed. Homestead made the underwriting decisions, and if accepted, undertook 100% of each risk, paying Mutual, a company for which Beitler was designated as the agent for service of process, 10 percent "for the use of their policy" because Mutual was authorized to do business in most states, including New Jersey. Finally, Homestead and its president, Beitler, had the final say on claims and their settlement, so much so that the defending trial attorney regularly communicated with the claims adjuster, Kolody, to discuss trial and settlement issues at Homestead's 52 Duane Street address. This was also the address of Euclid Services, which was Mutual's "general managing agent", and of Kolody himself.
On these facts derived mostly from the defendants and their employees, we are satisfied, for reasons discussed in Section III below, that the judge properly found as a matter of law that Homestead should be regarded as though it had the obligations of a primary insurer to Dominguez and his assignee, Venetsanos.

III.
Given the correctness of that determination, we disagree with appellants' contention that the judgment under review adjudicates obligations running from Homestead to Mutual and its rehabilitator, or prefers creditors in violation of Mutual's rehabilitation *470 plan.[2] Total control of this risk and the claims made thereunder were reposed in a broker-managing agent and an insurer unadmitted in New Jersey, both presided over by Beitler, and all within the same holding company. Mutual's technical status as primary insurer was almost incidental. Homestead may be both a creditor and debtor of Mutual and is undoubtedly subject to the rehabilitator's jurisdiction as to matters between it and Mutual. Indeed, the rehabilitator has alleged in a separate Pennsylvania suit that Homestead failed to honor reinsurance commitments, and that such failure helped trigger Mutual's downfall.[3]
However, it is not Homestead which is in rehabilitation. If Homestead has breached duties correctly deemed to be enforceable by a New Jersey insured, involving a New Jersey accident, insured and claimant, and is responsible for incurring additional liability under Rova Farms by reason of breach of duties in connection with the defense it controlled, Homestead can and should be directly answerable to that insured in a New Jersey Court. To the extent the findings of Homestead's liability here may be deemed to affect Mutual's policy obligation, or one running from Homestead to Mutual, these concerns should be addressed in the Pennsylvania forum.
*471 This case concerns Homestead's obligations which arose from its method of conducting business. No principle of comity precludes our accepting jurisdiction. As to the Uniform Liquidation of Insurers' Act, we think it inapplicable to this action against Homestead. The Act has not been adopted in Pennsylvania. See Uniform Insurance Liquidation Act, "Table of Jurisdictions Wherein Act Has Been Adopted" at N.J.S.A. 17:30C. However, as Pennsylvania has adopted a substantially similar Rehabilitation and Liquidation Act, 40 Pa. Stat. Ann. 221.1, et seq., it is entitled to reciprocal status. See Matter of Mut. Ben. Life Ins. Co., 258 N.J. Super. 356, 369, 609 A.2d 768 (App.Div. 1992).
In a case involving a more orthodox reinsurance situation, an insured would ordinarily be relegated to rights against the primary insurer, for reasons of comity and efficiency, as well as the Uniform Act. See Matter of Integrity Ins. Co., 240 N.J. Super. 480, 505, 573 A.2d 928 (App.Div. 1990); Murphy v. Ambassador Ins. Co., 195 N.J. Super. 274, 283, 478 A.2d 1243 (Ch.Div. 1984). This is not an orthodox reinsurance matter.
Our determination as to jurisdiction in this case is reinforced by our conviction that forcing Venetsanos to litigate the Rova Farms portion of her complaint, as well as her entitlement to pre- and post-judgment interest, in a foreign[4] rehabilitation forum solely against Mutual, would be oppressive, and would unjustly reward the parties most responsible for her present plight. This view is consistent with the long recognized analogous policy of interpreting unclear insuring agreements in a manner which avoids inequitable treatment of faultless insureds. Here, Mutual, the locally admitted insurer, merely provided the use of its policy for a consideration in order to enable a non-admitted carrier and its affiliates to solicit and evaluate risks, sell policies, wholly insure, and wholly control payments of claims on risks in this state. We will not consign a New Jersey insured or its uncompensated victim-assignee exclusively to uncertain and probably inadequate *472 recourse against an insolvent insurer in a foreign rehabilitation proceeding in such circumstances, particularly where the reinsuring agreement is unavailable.
These views find support in the treatises and case law. "It has been held in various cases that the beneficiary of an insurance policy can recover directly against a reinsuring company if the policy issued by the latter to the first insurer is a promise to perform the duties of the original insurer created by the first insurance and is not merely an undertaking to indemnify or reimburse the first insurer." Corbin on Contracts, § 807 (citing inter alia, Aetna Casualty and Surety Co. v. International ReInsurance Corp., 117 N.J. Eq. 190, 175 A. 114 (Ch.Ct. 1934); and Meyer v. National Surety Co., 90 N.J.L. 126, 100 A. 164 (Sup.Ct. 1917)). In Meyer, supra, the court said, "[w]hen a company reinsures all the risks and agrees that all losses ensuing under the policies shall be borne, paid and satisfied by the reinsuring company, it has been held, that a policyholder in the first company might maintain an action against the reinsuring company to recover a loss on property covered by a policy of the first company." Id. at 129, 100 A. 164 (citations omitted).
Here, the inexplicable absence of the actual reinsurance agreement from the files of both Mutual and Homestead precludes our examination of the terms of that agreement. However, we must consider the role of Homestead, its officers and affiliates, in the entire insuring process ranging from initial acceptance of this risk and its nominal allocation to Mutual, to its assumption of insuring responsibility for 100 percent of the risk and absolute control of the final claim adjustment. These key factors demonstrate that the "reinsurance" agreement, whether express or implied, oral or written, was one which would subject Homestead to direct suit under the authorities cited.
We recognize and endorse the general rule that an original insured does not enjoy a right of direct action against a true reinsurer. See Appleman, Insurance Law and Practice, § 7694. It is settled that an ordinary treaty of reinsurance *473 merely indemnifies the primary insurer against loss rather than against liability. Where, however, the reinsuring agreement itself provides, or the conduct of the reinsurer demonstrates, that it takes charge of and manages the defense of suits against the original insured, the reinsurer may be held to be a "privy" to the action. In such cases, judgment creditors of the insured have been allowed to proceed directly against the reinsurer. See, Homan v. Employers Reinsurance Corp., 345 Mo. 650, 136 S.W.2d 289 (1940); see also O'Hare v. Pursell, 329 S.W.2d 614 (Mo. 1959); Hollipeter v. Stuyvesant Ins. Co., 523 S.W.2d 595 (Mo. App. 1975); Slotkin v. Citizens Cas. Co. of N.Y., 614 F.2d 301, 316 (2nd Cir.1979), cert. den., 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980); Appleman, supra, § 7694.
The Pennsylvania case of Reid v. Ruffin, 503 Pa. 458, 469 A.2d 1030, 42 A.L.R.4th 1117 (1983) well illustrates the distinction we make. It, too, involved a suit asserting liability against a reinsurer for failure to settle or compromise. There, however, the primary insurer had retained most of the risk, reinsuring only 25 percent, and it controlled the settlement negotiations. Mere reservation by the reinsurer of the right to approve settlements, except where immediate decision is necessary and it is impracticable to obtain consent, was deemed insufficient to impute the insurer's bad faith to the reinsurer. Although the Pennsylvania Supreme Court recognized the several rules respecting an insured's right to direct action against a reinsurer, its rationale in Reid was specifically grounded in the absence of factors which are here present, and the presence of factors which are here absent. As stated in Keeton and Widiss, Insurance Law, § 7.8(a)(1) (Practitioner's Ed., 1988):
Does a reinsurer have a duty to the primary insured? The answer will usually depend on whether, in the total relationship, the reinsurer has some degree of control over the decisions concerning settlement with the third party claimant. If not, the basis for the duty is lacking; if so, it exists.
Thus, we find that as a matter of law, Homestead was properly held to the same liability as that of a primary insurer in the summary judgment motions. We do not, and need not, decide *474 whether Homestead was the "actual" or "primary" insurer as held by the motion judge.

IV.
As to Rova Farms liability, we recall, first, the factual admission in Homestead's answering pleading that Homestead, through "its agent, servant and/or employee, defendant Walter Kolody was responsible for the negotiations and settlement of this matter on behalf of Mutual...." This admission, itself determinative of status, is confirmed by the totality of relationship we have recounted above. Despite certain conclusionary statements in a Beitler affidavit, we find no "genuine issue as to any material fact challenged," R. 4:46-2, to preclude a finding that appellants have Rova Farms responsibility to the extent otherwise warranted by the motion showings.
This conclusion leads us to the question whether genuine factual questions preclude a finding on motion for summary judgment that Rova Farms factors have been sufficiently established to warrant judgment against appellants. Ordinarily, a plenary hearing would be required on such an issue. Estate of Louis Penn v. Amalgamated Gen. Agencies, 148 N.J. Super. 419, 424, 372 A.2d 1124 (App.Div. 1977). Here, however, letters from Zucker repeatedly called attention of appellants to the Rova Farms exposure arising from a strong likelihood that the probable verdict with interest would exceed the $100,000 policy limits. Settlement discussions were well along before the subject of Mutual's rehabilitation and its effect upon settlement was first raised in late July, 1987. Moreover, no authorization to settle was ever sought from the rehabilitator, despite the known Rova Farms exposure. Additionally, long after the Mutual rehabilitation was mentioned, appellants continued to insist upon an overall ceiling of 10 percent of the total settlement amount for all defendants, or about $37,000 under Dominguez' $100,000 policy.
It is not necessary that Venetsanos establish existence of a clear-cut, firm and authorized settlement demand within the limits *475 of the policy. Rova Farms, supra, 65 N.J. at 491, 323 A.2d 495. Rather, the insurer has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage. Doubts as to the existence of an opportunity to settle within the face amount of the coverage must be resolved in favor of the insured absent affirmative evidence that there was no such realistic possibility. Rova Farms, supra, 65 N.J. at 496, 323 A.2d 495. Arguments supportive of such affirmative showing have not been made on appeal. Indeed, the clear thrust of Zucker's correspondence on the issue leans heavily to belief that a tender at or near the $100,000 level would have materially enhanced settlement possibilities.
Preference by the carrier for its own interests exposes it under Rova Farms to responsibility for consequences of the irredeemable lost opportunity; payment of the policy limit plus the excess judgment and attendant interest.
Homestead created and benefitted from the scheme to pay Mutual for the "use of its policy" for boat risks procured, underwritten, claim-managed and paid under control of the same management. It will not here be permitted to avert Rova Farms responsibility by using Mutual's insolvency and rehabilitation as an excuse for failing to comply with its affirmative fiduciary duty to the insured fully to explore the settlement possibilities as proposed by its own attorneys. In the fiduciary role it properly should have exercised, Homestead was bound to consider itself potentially liable for the entire amount of any judgment just as was the defendant carrier in Rova Farms. The settlement discussions actively in progress during 1987 were, as correspondence from counsel indicated, severely hampered both by the unwillingness to make a realistic settlement proffer, and by use of Mutual's Pennsylvania rehabilitation process as an excuse for inaction. As earlier noted, no requests for settlement approval were made to the Mutual rehabilitator. Yet Homestead was the only ultimate source of payment, irrespective of the rehabilitation. Thus its own *476 financial interest was obviously of governing concern in the settlement process it controlled.
No arguments have been raised on appeal as to the amount of the judgment, nor respecting the judgment favoring Zucker and Wilson. The attorneys indisputably brought the Rova Farms problem to the attention of their clients.
Accordingly, we affirm the judgments under review.
NOTES
[1] Rova Farms Resorts v. Investors Ins. Co., 65 N.J. 474, 323 A.2d 495 (1974).
[2] We recognize that ordinarily a reinsurer may not prefer a given insured with the primary insurer. See 40 Pa. Stat. Ann. 221.34. See, e.g., N.J.S.A. 17B:32-61; Ainsworth v. General Reinsurance Corp., 751 F.2d 962, 966 (8th Cir.1985) (reinsurance proceeds are to be distributed to benefit all creditors of insolvent insurer and direct payment by reinsurer to original insured is forbidden); State ex. rel. Low v. Imperial Ins. Co., 140 Ariz. 426, 682 P.2d 431 (App. 1984) (reinsurance proceeds payable to insolvent insurer by reason of claims arising in an ancillary state are general assets vested solely in the domiciliary states' liquidator).
[3] As observed in our opinion, supra at p. 464, 638 A.2d at p. 1335, if a risk is reinsured with a non-admitted insurer such as Homestead, the admitted primary insurer must continue to maintain a statutorily adequate amount of capital for covering such exposure.
[4] There is no ancillary New Jersey proceeding.