898 A.2d 1041 (2006)
386 N.J. Super. 41
Parry AFTAB, Esq., Aftab & Savitt, and Nancy Savitt, Esq.; Cohn Lifland, Pearlman, Herrmann & Knopf, LLP, and Jeffrey Herrmann, Esq.; Morton Covitz, Esq.; Middlebrooks & Shapiro, P.C., and Estate of Richard P. Shapiro, Esq.; Leslie Bierman, Esq.; Robert Vort, Esq.; Robert Mazeau, Esq.; and Matthew Trella, Esq., Plaintiffs-Appellants, and
Federbusch & Weinstein and Janell Weinstein, Esq., Plaintiffs,
v.
NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION, Defendant-Respondent, and
Leah Heller; Joseph Callaremi, Jr.; Anthony Callaremi; Callaremi Lincoln-Mercury, Inc.; Kathi F. Fiamingo, Esq.; Edward D. Turen; Jan Turen; Lynchen Wassil; Julius Wassil; Burgdorff/Era Realtors; Mary Lenk Properties Division; Mary Lenk; Ingrid Werner; Ferro, Labella, Logerfo & Zucker; Rocco J. Labella; Sarasota-Coolidge Equities II; Sarasota, Inc.; Charles A. Poekel, Jr.; Essex County; Essex County Sheriff's Department; Sheriff Armando Fontura; Sergeant Cramer; Detective Tully; Detective Jackson; Lieutenant Mercandante; Leonora Mansour; Mansour Mansour; Farberware, Inc.; S.W. Farber, Inc.; Federated Department Stores, Inc.; Leviton Manufacturing Company, Inc.; Walter Kiddie Company, Inc.; Bruckner Manufacturing Corp.; *1042 Sterns; Salton/Maxim Housewares, Inc.; Joyce A. Poliseno; Anthony J. Macri, Esq.; James F. Carney, Esq.; James N. Tracy, III, Esq.; Tansey, Faning, Haggerty, Kelly, Convery & Tracy; Terry Benbow, Administrator ad Prosequendum of the Estate of Shadriah Benbow, individually and as guardian ad litem for Terry Benbow, Jr. and Tanesha Benbow; Passaic County Probation Department; Joanne DiFranco; Toni Geracitano; Lenny Gordon; Alice Roedema; Amin Jihid (a/k/a Amin Jihhad); Kristen Cooper; Jamica Evans; Big Boing Golf/Koosh Jr. Company; CYO Camp on Nosenzo Pond Road in West Milford, County of Passaic; Catholic Youth Organization; Dioceses of Paterson; Straight and Narrow; Toys "R" Us; Joseph Batelli; and Alfred Bluh, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 2006.
Decided May 31, 2006.
Robert B. Hille, Secaucus, argued the cause for appellants (Waters, McPherson, McNeill, attorneys; Mr. Hille, of counsel and on the brief).
Mark M. Tallmadge, Florham Park, argued the cause for respondent (Bressler, Amery & Ross, attorneys; Richard R. Spencer, Jr., of counsel; Mr. Tallmadge and Marie Saraceni, on the brief).
Francis & Berry, and Joseph C. Tanski, Boston, MA (Nixon Peabody) of the Massachusetts bar, admitted pro hac vice, attorneys *1043 for amicus curiae National Conference of Insurance Guaranty Funds (Mr. Tanski, of counsel; Hugh P. Francis, on the brief).
Before Judges COLLESTER, LISA and S.L. REISNER.
The opinion of the court was delivered by
LISA, J.A.D.
Plaintiffs are New Jersey attorneys who have been named as defendants in legal malpractice suits in New Jersey. Their professional liability insurance carrier, "American National Lawyers Insurance Reciprocal (Risk Retention) Group" (ANLIR), became insolvent, and plaintiffs sought defense and indemnification from the New Jersey Property-Liability Insurance Guaranty Association (PLIGA). Because ANLIR was a risk retention group, PLIGA denied coverage. Plaintiffs brought this action seeking a declaration that PLIGA was responsible to provide coverage. The Law Division granted PLIGA's summary judgment motion and dismissed the complaint.
Plaintiffs argue on appeal that because ANLIR was a reciprocal as well as a risk retention group it was not excluded from PLIGA coverage. Alternatively, plaintiffs argue that PLIGA coverage applied because ANLIR's reinsurer, the Reciprocal of America (ROA), which also became insolvent, was a PLIGA member and exerted controlling influence over ANLIR. Thus, according to plaintiffs, the reinsurance veil should be pierced and ANLIR insureds and claimants against them should be entitled to PLIGA coverage because they would be entitled to coverage from ROA. We reject these arguments. We hold that an insurer registered in New Jersey solely as a risk retention group is not covered by PLIGA regardless of the status of that insurer in another jurisdiction as a reciprocal, and regardless of the status of its reinsurer or its relationship with its reinsurer. Accordingly, we affirm.

I.
ANLIR was formed in Tennessee in 1992. Its officers were authorized to execute and file documents to obtain licensure to transact business as an insurance company in Tennessee, and to obtain registration or recognition to transact business in any other jurisdiction. A Virginia corporation known as Lawyers Management Corporation (Lawyers Management) was named as ANLIR's "attorney-in-fact." ANLIR entered into a Management and Insurance Services Agreement in which ANLIR and Lawyers Management each appointed Virginia Professional Underwriters, Inc. (Virginia Professional) as their exclusive management and insurance services company to perform a wide range of specified duties on their behalf. Virginia Professional also agreed to loan ANLIR and Lawyers Management up to $3.5 million in start-up funds. Virginia Professional later changed its name to The Reciprocal Group (TRG).
On December 11, 1995, the New Jersey Department of Banking and Insurance (the Department) wrote to ANLIR confirming that it had "filed the necessary documents" with the State of New Jersey as detailed under P.L. 1993, c. 240 [N.J.S.A. 17:47A-1 to -12 (New Jersey Risk Retention Act) (NJRR Act)] and "is considered registered in New Jersey as a Risk Retention Group." The letter advised ANLIR
that although registered[,] the group has not been subjected to any admission process, and as such has no status in New Jersey other than as a Risk Retention Group. The group should not make any representations to prospective *1044 new members in New Jersey that the Department approves or has licensed the group.
[Emphasis added.]
At the time the underlying malpractice claims were made or filed, and as of January 31, 2003, plaintiffs were ANLIR subscribers. Set apart in the center of the title page of the policies issued to plaintiffs by ANLIR was the following:
NOTICE
THIS POLICY IS ISSUED BY YOUR RISK RETENTION GROUP. YOUR RISK RETENTION GROUP MAY NOT BE SUBJECT TO ALL OF THE INSURANCE LAWS AND REGULATIONS OF YOUR STATE. STATE INSURANCE INSOLVENCY GUARANTY FUNDS ARE NOT AVAILABLE FOR YOUR RISK RETENTION GROUP.

[Emphasis added.]
ANLIR's by-laws, referring to itself as "the Reciprocal," provided:
The purpose of the Reciprocal is to exchange contracts of indemnity or insurance with individuals, partnerships, corporations, and other entities through the facilities of a common Attorney-In-Fact (as defined herein) pursuant to the provisions of Chapter 16 of Title 56 of the Tennessee Code Annotated and as a risk retention group in accordance with the [federal] Liability Risk Retention Act of 1986 and any amendments thereto. The above stated purpose shall not preclude the Reciprocal from performing all lawful acts, duties, undertakings and services consistent with the laws of the State of Tennessee. In addition, the Reciprocal shall have the power to conduct and carry on its activities, subject to the prior approval of the Attorney-In-Fact, in any state, territory of the United States or foreign country in conformity with state and federal laws.

[Emphasis added.]
The by-laws further provided: "Subscribership in the Reciprocal shall consist of individuals, partnerships, corporations, and other entities engaged in the practice of law which are insured under the name of the Reciprocal through the facilities of the Attorney-In-Fact acting on behalf of the several Subscribers." Subscribers were those "executing, or otherwise being bound by, the Subscriber's Agreement and Power of Attorney or any like agreement of the Reciprocal, if required under applicable law." Each insured lawyer, either individually or as an insured under a corporation's, partnership's, or association's policy, would have one vote at ANLIR's annual or special meetings.
ANLIR's Board of Directors was given powers and duties including: "(a) To supervise the finances and affairs of the Reciprocal to such extent as to assure conformity with (i) the laws and regulations of jurisdictions in which it is licensed, admitted, recognized, or authorized to transact business, including without limitation, the Liability Risk Retention Act of 1986 ...." The Board members were to be drawn from representatives of states in which a state or local bar organization exclusively endorsed ANLIR's professional liability insurance programs, and at least seventy-five percent of the Board members were to be comprised of subscribers or their employees.
In the Operating Guidelines section of the by-laws, another statement of purpose provided: "The purpose for which the Reciprocal is formed is to carry on and transact in the State of Tennessee and other jurisdictions the business of a reciprocal insurer for the benefit of its Subscribers by providing insurance." ANLIR was to endeavor to maintain a minimum surplus *1045 of assets over liabilities of at least $2 million. If additional funds were needed, subscribers could be required to make loans or payments to ANLIR, and if excess funds were available, they could be distributed to subscribers.
A form of Subscriber's Agreement and Power of Attorney for ANLIR provided that the subscribers appointed Lawyers Management as attorney-in-fact to carry out the purposes and objectives of the agreement. It further provided:
The Reciprocal, through the Attorney-In-Fact, shall have the power to insure lawyers, as may be authorized by the Board of Directors and the Attorney-In-Fact, which are similar or related with respect to liability exposure, against loss or liability of every kind, nature or description, as may be authorized and permitted by state and federal laws (including the Liability Risk Retention Act of 1986 and any amendments thereto), and to issue contracts of indemnity or insurance on behalf of subscribers covering any or all such loss, liability, or liabilities, subject to the provisions contained herein and the Reciprocal's Bylaws.
[Emphasis added.]
Under the Subscriber's Agreement, Lawyers Management would make contracts of indemnity or insurance with subscribers; accept or cede reinsurance; adjust, settle, and pay claims; endorse checks and other papers to pay claims; invest and maintain ANLIR's funds; accept service and sue on ANLIR's behalf; and incur and pay expenses on ANLIR's behalf. Many of these powers and duties were further forwarded to Virginia Professional (renamed TRG), pursuant to the Management and Insurance Services Agreement.
TRG was also the attorney-in-fact for Reciprocal of America (ROA), a Virginia-chartered and domiciled reciprocal. ROA is a member of PLIGA. ROA is also one of ANLIR's reinsurers, and it appears that 100% of ANLIR's risk was reinsured, either by ROA or by "Cologne/GenRe." According to the reinsurance agreement, ANLIR was required to "investigate and settle or defend all claims and losses." The agreement further provided that "This Agreement is solely between the Company [ANLIR] and the Reinsurer.... In no instance shall any insured of the Company or any claimant against an insured of the Company have any rights under this Agreement."
On January 31, 2003, the Tennessee Commissioner of Commerce and Insurance was appointed as ANLIR's rehabilitator pursuant to the Tennessee Insurers Rehabilitation and Liquidation Act, TENN.CODE ANN. §§ 56-9-101 to -511. A liquidation order was filed on June 3, 2003, declaring that further attempts to rehabilitate ANLIR would be futile, terminating coverage, and setting August 30, 2004, as the deadline for filing claims regarding ANLIR.
The Circuit Court of Richmond, Virginia found that ROA and TRG "were so inextricably intertwined that they constituted a `single insurance business enterprise'" and the two financially-troubled entities were placed in joint receivership. In an application for liquidation of ROA and TRG, the Deputy Receiver of those two entities noted that because of ROA's "deep insolvency" of at least $200 million, payment of claims was discontinued.
Because of ANLIR's insolvency, plaintiffs contend that PLIGA is responsible for providing them coverage, either directly or because of ROA's insolvency.

II.
Some background regarding risk retention groups and their relationship to state *1046 guaranty associations is helpful to our analysis. In 1981, Congress passed the Product Liability Risk Retention Act of 1981 (PLRRA), Pub.L. No. 97-45, 95 Stat. 949 (1981) (codified at 15 U.S.C.A. §§ 3901 to 3906), to provide a vehicle by which product sellers could obtain product liability insurance at lower rates. See H.R. REP. No. 97-190 (1981), reprinted in 1981 U.S.C.C.A.N. 1432 (commenting that the PLRRA "will reduce the problem of the rising cost of product liability insurance by permitting product manufacturers to ... self-insure through insurance cooperatives called `risk retention groups'"). Reduced cost of coverage was achieved by exempting risk retention groups from many state laws and regulations that prohibited or restricted risk retention groups. One of the preempted areas precluded participation in state guaranty associations:
Sec. 3(a) Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would
....
(2) require or permit a risk retention group to participate in any insurance insolvency guaranty association in which an insurer licensed in the State is required to belong;
[Pub.L. No. 97-45, § 3 (now 15 U.S.C.A. § 3902(a)(2)).]
The legislative history illuminates the purpose of this provision:
Paragraph (2) prohibits a State from requiring or permitting a risk retention group to participate in an insurance insolvency guaranty fund it may have in which licensed insurers are required to participate. There are two reasons for this exclusion. First, risk retention groups are not full-fledged multi-line insurance companies, but limited operations providing coverage only to member companies, and only for a narrow group of coverages. Second, there will be a strong incentive for risk retention groups to set adequate premiums and establish adequate reserves if each member knows there is no other source of funds (other than its own corporate assets) from which to pay claims.

[H.R. REP. No. 97-190 (1981), reprinted in 1981 U.S.C.C.A.N. 1432, 1445 (emphasis added).]
There was therefore a recognition that as part of the trade-off for limited State regulation risk retention groups were "on their own" if they became insolvent. Members of these self-governing groups were on notice of the responsibility to set premiums at levels to establish adequate reserves to cover claims. If they did not, and if the group became insolvent, they would have no recourse against a guaranty association. On the other side of the coin, the PLRRA prohibited States from requiring or allowing risk retention groups to contribute to guaranty associations. This was part of the overall scheme to keep costs down.
In 1986, Congress amended the PLRRA to expand the scope of commercial liability insurance coverage available through risk retention groups. The law was renamed the Liability Risk Retention Act of 1986. See Pub.L. 99-563, 100 Stat. 3170 to 3178 (codified at 15 U.S.C.A. §§ 3901 to 3906). The obvious purpose of the amendment was to provide the same lower cost insurance option to an expanded group of commercial entities.
The LRRA continued in its exact form the proscription contained in the PLRRA against participation by risk retention groups in State guaranty associations. 15 U.S.C.A. § 3902(a)(2). In the legislative history, Congress again commented upon the trade-off between riskier coverage and lower rates as well as the continuing prohibition *1047 against risk retention groups participating in state guaranty associations:
Since a risk retention group is simply a group of businesses or others who join together to set up their own insurance company only to issue insurance policies to themselves, it was believed that by encouraging such groups, the subjective element in underwriting could be reduced. The risk retention group would know its own loss experience and could adhere closely to it in setting rates.
[H.R. REP. No. 99-685 (1986), reprinted in 1986 U.S.C.C.A.N. 5304, 5305-5306.]
....
The Committee observes that Section 3(a)(2) of the Act provides that a risk retention group is exempt from any State law that would require or permit a risk retention group to participate in any insurance insolvency guaranty association to which an insurer licensed in the State is required to belong. Consistent with this, it is the Committee's intent that States be precluded from requiring or permitting risk retention groups to participate either directly or indirectly in an insurance insolvency guaranty association to which an insurer licensed in the State is required to belong. The Committee regards as impermissible such practices as diverting, borrowing, or otherwise using the funds or assessment authority of any such insolvency guaranty association for insurers licensed in the State to underwrite the obligations of a risk retention group or to establish, fund, or otherwise assist a risk retention group insolvency guaranty association.
[H.R. REP. No. 99-685 (1986), reprinted in 1986 U.S.C.C.A.N. 5304, 5314 (emphasis added).]
The 1986 amendments added a new provision, which authorized states, as an exception to the general preemption of risk retention group regulation, to require risk retention groups to include in their policies a notice that guaranty association funds are not available:
(1) ... [A]ny State may require such a group to
....
(I) provide the following notice, in 10-point type, in any insurance policy issued by such group:
"NOTICE
"This policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your State. State insurance insolvency guaranty funds are not available for your risk retention group."
[15 U.S.C.A. § 3902(a)(1)(I) (emphasis added).]
In 1993, New Jersey enacted the NJRR Act. L. 1993, c. 240. Consistent with the mandatory provisions of the LRRA, the NJRRG Act provides that "[n]o risk retention group, whether domiciled in this State or otherwise, shall be eligible to become a member of, contribute to, or derive any benefit from [PLIGA]...." N.J.S.A. 17:47A-9. As permissively authorized by the LRRA, New Jersey chose to require all risk retention groups to include in their application forms, and on the front and declaration pages of their policies, in 10-point, boldface type, the notice in the exact wording, set forth in the LRRA. N.J.S.A. 17:47A-4g; (see also N.J.S.A. 17:47A-3e)(requiring the notice in policies issued by New Jersey domiciled risk retention groups).

III.
Against this Federal and State legislative backdrop, we consider plaintiffs' arguments *1048 that ANLIR is entitled to PLIGA coverage.

A.
We first consider plaintiffs' claim of entitlement to PLIGA coverage based on ANLIR's status without regard to ROA. Plaintiffs contend that ANLIR was an "insolvent insurer" under the PLIGA Act, N.J.S.A. 17:30A-1 to -20, and that their claims were "covered claims" under the PLIGA Act. They consider it irrelevant that ANLIR never paid any contributions into the PLIGA Fund. In advancing this argument, plaintiffs put aside ANLIR's status as a risk retention group, which would result in statutory exclusion from PLIGA coverage, and put forward ANLIR's status as a reciprocal. The argument is fundamentally flawed, and we reject it.
When an insurer is ordered into liquidation, PLIGA's role is automatically activated as to that insurer. The purpose of the PLIGA Act was to "minimize financial loss to claimants or policyholders because of the insolvency of an insurer." N.J.S.A. 17:30A-2(a); Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504, 515, 800 A.2d 54 (2002). PLIGA manages and administers claims against an insolvent insurer, and is "obligated to the extent of the covered claims against an insolvent insurer incurred prior to or 90 days after the determination of insolvency...." ARCNET Architects, Inc. v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 377 N.J.Super.52 102, 105, 871 A.2d 728 (App.Div.2005) (citing and quoting N.J.S.A. 17:30A-6,-8a(1)). PLIGA is "deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Id. at 105-06, 871 A.2d 728 (quoting N.J.S.A. 17:30A-8a(2)).
PLIGA's obligation is limited to the payment of "covered claims," and it is not "a panacea for all problems caused by insurance company insolvencies." Carpenter Tech. Corp., supra, 172 N.J. at 524, 800 A.2d 54. It was not designed "as a form of reinsurance for every insurer who becomes insolvent." Id. at 524-25, 800 A.2d 54. The PLIGA Act defines "covered claim" as "an unpaid claim, ... which arises out of and is within the coverage, and not in excess of the applicable limits of an insurance policy to which this act applies, issued by an insurer, if such insurer becomes an insolvent insurer" and if the claimant is a New Jersey resident or raises property damage claims regarding property permanently located in New Jersey. N.J.S.A. 17:30A-5[1] (emphasis added). That PLIGA is not designed as a full substitute for an insolvent insurer is evidenced by the statutory exclusions to "covered claims," including: interest on unliquidated claims; punitive damages unless covered by the policy; counsel fees for prosecuting suits for claims against PLIGA; and charges for the insolvent insurer's failure to have expeditiously settled claims. Ibid. PLIGA's payment limit is generally $300,000 per claimant, except as to covered claims for personal injury protection under automobile liability insurance policies provided pursuant to N.J.S.A. 39:6A-4. N.J.S.A. 17:30-8a(1).
Fundamentally, a "covered claim" under PLIGA must arise out of "an insurance policy to which [the PLIGA Act] applies." N.J.S.A. 17:30A-5. Plaintiffs contend that the PLIGA Act applies to ANLIR's policies because ANLIR, in addition to being a risk retention group, is a reciprocal. Indeed, *1049 it was chartered under Tennessee law as a reciprocal. Therefore, plaintiffs contend that the statutory prohibition in the NJRR Act, N.J.S.A. 17:47A-9, does not preclude ANLIR from PLIGA coverage. Further, relying on Eastern Seaboard Pile Driving Corp. v. New Jersey Property-Liability Insurance Guaranty Ass'n, 175 N.J.Super. 589, 421 A.2d 597 (App.Div.1980), plaintiffs argue that the failure of ANLIR to pay into the PLIGA Fund does not preclude eligibility for PLIGA benefits. Finally, plaintiffs argue that the LRRA could not and did not preempt participation by a risk retention group in State guaranty associations. We find these arguments unpersuasive. We discuss them in turn.
ANLIR's status in Tennessee as a reciprocal is not dispositive of plaintiffs' claim against PLIGA. In New Jersey, ANLIR sought nothing more than registration as a risk retention group, and the Department granted it "no status in New Jersey other than as a Risk Retention Group." The Department noted that ANLIR had "not been subjected to any admission process," and it directed ANLIR to refrain from making any "any representations to prospective new members in New Jersey that the Department approves or has licensed the group." Thus, it is clear that for purposes of its operations in New Jersey, ANLIR was operating solely as a risk retention group, and it enjoyed no other status.
In addition to plaintiffs' ANLIR policies not being policies to which the PLIGA Act applies, ANLIR cannot qualify as an "insolvent insurer." Under the PLIGA Act, "[i]nsolvent insurer" means:
(1) a licensed insurer admitted pursuant to R.S.17:32-1 et seq. or authorized pursuant to R.S.17:17-1 et seq., or P.L. 1945, c. 161 (C.17:50-1 et seq.) to transact the business of insurance in this State either at the time the policy was issued or when the insured event occurred, and (2) against whom an order of liquidation has been entered with a finding of insolvency by a court of competent jurisdiction. "Insolvent insurer" does not include any unauthorized or nonadmitted insurer whether or not deemed eligible for surplus lines pursuant to P.L.1960, c. 32 (C.17:22-6.37 et seq.).
[N.J.S.A. 17:30A-5 (emphasis added).]
In view of the use of the two terms, "authorized" and "admitted," "which have technical meanings in the insurance law of this State," the PLIGA Act was "intended to restrict covered insolvent insurers to domestic insurers authorized to transact the business of insurance in this State under N.J.S.A. 17:17-1 et seq. and foreign insurance companies admitted to transact any class or classes of insurance in this State under N.J.S.A. 17:32-1 et seq." R.R. Roofing & Bldg. Supply Co. v. Fin. Fire & Cas. Co., 85 N.J. 384, 393, 427 A.2d 66 (1981). The Court held that the Legislature clearly intended to exclude from PLIGA coverage "surplus lines insurers," which "do not transact the business of insurance in this State," but rather, receive insurance business that has been "exported-that is, placed with them by a licensed surplus lines agent. In short, they are eligible only to receive insurance business from New Jersey but are not authorized or admitted to do business in the State." Id. at 392-93, 427 A.2d 66. As the Court noted, a 1980 amendment to the PLIGA Act made this interpretation clear. Id. at 393, 427 A.2d 66.
A 1979 amendment had added the reference to "C.17:50-1 et seq." to the PLIGA "insolvent insurer" definition, establishing the statutory scheme at N.J.S.A. 17:50-1 to -19 (the Reciprocal Act), as an alternative source of becoming "authorized." The *1050 Reciprocal Act provides that "subscribers," who may be individuals, partnerships, trustees, or New Jersey corporations, "are hereby authorized to exchange reciprocal or interinsurance contracts with each other and with individuals, partnerships, trustees and corporations of other States, districts, provinces and countries, for any or all of the kinds of business for which a company may be formed or authorized to transact" under New Jersey's insurance statutes, excluding life insurance. N.J.S.A. 17:50-1. By following the Reciprocal Act procedures, which would involve much greater oversight by the Department and proof of financial responsibility, all at a cost, a reciprocal can obtain a "certificate of authority showing that the exchange has complied with all the requirements of this act and is authorized to transact business in this State..." N.J.S.A. 17:50-11.
The record contains no evidence that ANLIR ever obtained a certificate of authority as a New Jersey reciprocal, and the Department's December 11, 1995 letter emphasized that ANLIR should not represent that it was approved or licensed in New Jersey. Although reciprocals can qualify as licensed insurers admitted or authorized to transact the business of insurance in New Jersey, it does not follow that all reciprocals do so qualify. That is the fatal flaw in plaintiffs' argument. Even though ANLIR structured itself as a reciprocal under Tennessee law and was registered as a risk retention group in New Jersey, it did not follow the procedures necessary to be admitted or authorized in New Jersey, pursuant to the Reciprocal Act or any other New Jersey law. Because the PLIGA Act provides that "`[i]nsolvent insurer' does not include any unauthorized or nonadmitted insurer," ANLIR could not be considered an "insolvent insurer" under the PLIGA Act.
As part of their argument that ANLIR's reciprocal status supersedes its risk retention group status, plaintiffs rely upon the exclusivity provision in the Reciprocal Act:
17:50-1. Exchange of contracts authorized; law exclusive
Individuals, partnerships, trustees and all corporations of this State, herein designated "subscribers," are hereby authorized to exchange reciprocal or interinsurance contracts with each other and with individuals, partnerships, trustees and corporations of other States, districts, provinces and countries, for any or all of the kinds of business for which a company may be formed or authorized to transact under the provisions of chapter seventeen of Title 17 of the Revised Statutes, except life insurance.
Such contracts and the exchange thereof and such subscribers, their attorneys in fact and representatives shall be regulated by this act, and by no other statute of this State relating to insurance, except as herein otherwise provided.
[N.J.S.A. 17:50-1 (emphasis added).]
Plaintiffs argue that the prohibition in the NJRR Act, N.J.S.A. 17:47A-9, against risk retention groups participating in PLIGA, does not govern reciprocals which are also risk retention groups. We do not agree.
To be authorized to transact business in New Jersey as a reciprocal, any insurance company, whether domestic or foreign, must comply with all of the requirements of the Reciprocal Act and obtain a certificate of authority. N.J.S.A. 17:50-11. ANLIR has not done this. Therefore, the exclusivity provision in N.J.S.A. 17:50-1 does not apply to ANLIR. Further, that provision pertains only to other statutory provisions to the extent that they regulate "[s]uch [reciprocal] contracts and the exchange thereof" and relate "to insurance." The provision thus pertains to the internal *1051 operations of reciprocals. The provision does not insulate reciprocals from requirements of general applicability in insurance regulation and that are outside the insuring transactions undertaken by reciprocals. See In re Reorganization of the Med. Inter-Ins. Exch. of N.J., 328 N.J.Super. 344, 357, 746 A.2d 25 (App.Div.) (holding that notwithstanding the exclusivity provision, reciprocal insurers remain subject to the general "regulatory powers" of the Department), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000).
We also note that the exclusivity provision, by its terms, applies only "except as herein otherwise provided." Another provision in the Reciprocal Act prohibits provisions in policies issued by reciprocals that are "in conflict with the laws of this State." N.J.S.A. 17:50-12. A provision in a policy issued by a reciprocal operating in New Jersey as a risk retention group that authorized PLIGA membership would clearly be in conflict with the NJRR Act. Thus, any such provision would be an exception to the exclusivity provision and therefore fall outside its scope.
We next consider plaintiffs' contention that, based upon our holding in Eastern Seaboard, the fact that ANLIR did not pay into the PLIGA Fund does not preclude eligibility for PLIGA benefits. In that case, we addressed whether a Delaware Corporation with New Jersey offices met the following coverage criteria under the PLIGA Act at N.J.S.A. 17:30A-5: "(1) The claimant or insured is a resident of this State at the time of the insured event; or (2) the property from which the claim arises is permanently located in this State." Eastern Seaboard, supra, 175 N.J.Super. at 591, 421 A.2d 597. These residency issues are not relevant to the issues before us in this case. Although we noted that nothing in the PLIGA Act conditions eligibility for benefits upon contributions to the PLIGA Fund, id. at 593, 421 A.2d 597, that principle is not dispositive of entitlement to coverage. As we have stated, where the claim is not a "covered claim" and does not derive from an "insolvent insurer" as defined in the PLIGA Act, there is no PLIGA coverage. Thus, plaintiffs' reliance on Eastern Seaboard does nothing to advance their cause.
Finally, we address plaintiffs' arguments regarding the pertinent provisions of the federal and New Jersey risk retention acts. Plaintiffs argue that although the LRRA "freed risk retention groups from the costs associated with a multitude of State guaranty fund requirements," it "does not require the states to deprive their citizens of protection from their guaranty funds who fall victim to insolvent risk retention groups." We find that argument unpersuasive in light of the language of the LLRA and, particularly, the legislative history we have previously cited. Congress intended to preclude risk retention groups from participating "either directly or indirectly" in guaranty associations.
However, even if we gave credence to the argument, it would not matter. The New Jersey Legislature has ordained that no risk retention group, domestic or foreign, "shall be eligible to become a member of, contribute to, or derive any benefit from [PLIGA]...." N.J.S.A. 17:47A-9. Thus, whether mandated by the LRRA or not, the NJRR Act unequivocally proscribes the payment of benefits from PLIGA for a risk retention group. This conclusion is bolstered by the inclusion in the NJRR Act of the notice requirement authorized by the LRRA. That notice was contained in the ANLIR policies issued to plaintiffs.
Plaintiffs further argue that the LRRA is inoperable in defeating PLIGA coverage because it conflicts with the presumption against federal regulation of insurance embodied *1052 in the McCarran-Ferguson Act, 15 U.S.C.A. §§ 1011 to 1015. This argument has no merit, in view of 15 U.S.C.A. § 1012(b) (emphasis added), which provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance...." The LRRA's purpose was to address insurance availability and affordability by limiting State control over risk retention groups. This purpose "relates to the business of insurance." Thus the LRRA and the McCarran-Ferguson Act do not conflict.
Even if it could be said that the McCarran-Ferguson Act's presumption in favor of State regulation applies, that is consistent with what occurred here. The New Jersey Legislature enacted the NJRR Act to require that risk retention groups' policies contain a notice stating that the policies are not eligible for State insurance insolvency guaranty fund coverage. Thus, a State law, not just the federal law, provides that State insurance insolvency guaranty fund coverage is not available for risk retention group policies. The State created PLIGA, and it has the authority to expand or contract the definition of an "insolvent insurer" for which coverage will be available under PLIGA's funds. Nothing precluded the New Jersey Legislature from passing the NJRR Act's provision that guaranty association coverage did not apply. Once the NJRR Act became law, questions of conflict between the LRRA and the McCarran-Ferguson Act became moot.

B.
We next consider plaintiffs' "single enterprise" theory. Plaintiffs contend that because ANLIR reinsured its policies with ROA and because "ROA was ANLIR, and ANLIR was ROA," ROA's status as an insolvent PLIGA member should provide coverage for ANLIR's insureds. We do not agree.
Plaintiffs rely upon Venetsanos v. Zucker, Facher & Zucker, 271 N.J.Super. 459, 638 A.2d 1333 (App.Div.), certif. denied, 137 N.J. 166, 644 A.2d 614 (1994). In that case, the plaintiff, a victim of a boating accident, brought an action against defendant Manuel Dominguez and others, alleging negligent operation and product defects. Id. at 462, 638 A.2d 1333. The Zucker law firm was retained by the insurer to represent Dominguez, pursuant to an insurance policy nominally issued by one insurer, Mutual, which was authorized to do business in New Jersey. Ibid. Another insurer, Homestead, which was not authorized to do business in New Jersey, was a 100% reinsurer of Dominguez' policy with Mutual. Ibid. Mutual entered rehabilitation proceedings in Pennsylvania. Ibid. After a jury trial, Dominguez' liability was fixed at approximately $315,000; Dominguez assigned his rights against Mutual to Venetsanos for that amount, which could not be recovered from Mutual due to its insolvency. Id. at 462-63, 638 A.2d 1333.
Venetsanos then filed against the Zucker firm and Homestead, and asserted in a summary judgment motion that Mutual had been merely "fronting" for Homestead in New Jersey, such that Homestead should be considered the direct insurer on Dominguez' policy. Id. at 463, 638 A.2d 1333. The trial court granted the motion, and we affirmed. Ibid. We found it significant that the attorney regularly went to Homestead, not Mutual, to obtain a determination whether a claim should be paid, id. at 464-67, 638 A.2d 1333, and we held "as a matter of law that Homestead should be regarded as though it had the obligations *1053 of a primary insurer to Dominguez and his assignee, Venetsanos." Id. at 469, 638 A.2d 1333. We rejected arguments that Mutual's insolvency required deference under the Uniform Insurers' Liquidation Act, because Homestead was not in rehabilitation. Id. at 468-71, 638 A.2d 1333.
We noted that "[i]n a case involving a more orthodox reinsurance situation, an insured would ordinarily be relegated to rights against the primary insurer, for reasons of comity and efficiency, as well as the Uniform Act." Id. at 471, 638 A.2d 1333. "We recognize[d] and endorse[d] the general rule that an original insured does not enjoy a right of direct action against a true reinsurer." Id. at 472, 638 A.2d 1333. "Where, however, the reinsuring agreement itself provides, or the conduct of the reinsurer demonstrates, that it takes charge of and manages the defense of suits against the original insured, the reinsurer may be held to be a `privy' to the action." Id. at 473, 638 A.2d 1333. "In such cases, judgment creditors of the insured have been allowed to proceed directly against the reinsurer." Ibid. In the case presented, Mutual "merely provided the use of its policy for a consideration in order to enable a non-admitted carrier ... to solicit and evaluate risks, sell policies, wholly insure, and wholly control payments of claims on risks in this state." Ibid.
Plaintiffs rely upon these principles as authority for the proposition that ANLIR's reinsurer, ROA, is responsible for claims against ANLIR and, because ROA is an insolvent PLIGA member, plaintiffs are entitled to PLIGA coverage. First, we note that the terms of the reinsurance agreement plainly describe a traditional insurer-reinsurer relationship, and provide no basis for direct claims against ROA. Further, the record contains no specific facts to indicate that ROA took charge of the claims, evaluated them, directed their resolution, communicated with assigned counsel, or otherwise controlled the claims. Nor is there any evidence of any contact between plaintiffs or the claimants against them with ROA. And ROA was not ANLIR's only reinsurer.
Plaintiffs rely on corporate interconnectedness of ANLIR, ROA and TRG to support an inference of control. It is possible that evidence of control by ROA could be further developed (or negated) beyond what is now in the record. If we deemed that issue potentially dispositive, we might find it appropriate to remand the matter for further discovery. But we do not view it that way. Even if control by ROA were established, we would not find PLIGA coverage. Nothing in Venetsanos involved making PLIGA responsible for those claims against a reinsurer. It is one thing to hold responsible a reinsurer for losses of an insurer that was merely "fronting" for the reinsurer; it is another to require additional payments from all of the policyholders whose premium surcharges support PLIGA so that PLIGA can cover losses in an arrangement that amounted to "fronting."
Insureds, particularly lawyers and law firms, should not be heard to seek PLIGA coverage on policies that clearly state that "STATE INSURANCE INSOLVENCY GUARANTY FUNDS ARE NOT AVAILABLE FOR YOUR RISK RETENTION GROUP." As subscribers in the reciprocal, plaintiffs were entitled to participate in the oversight of ANLIR, giving them the ability to become active in avoiding ANLIR's insolvency. These factors militate against finding PLIGA coverage for plaintiffs by extending Venetsanos to the present situation.
Allowing ANLIR's insureds access to the PLIGA Fund based on its connection *1054 with ROA would be contrary to public policy. It would permit the creation, structuring and affiliation of entities, operating under different statuses in different states, as a means of dipping into guaranty funds without paying into them, all the while avoiding the more rigorous and costly regulation attendant to traditional insurers. Risk retention groups might find it in their interest to structure their dealings so that a "reinsurer" can provide guaranty coverage for the insureds, while the member insureds never have to pay into the guaranty system. We decline to extend the Venetsanos holding to permit such a result.
We further note that the PLIGA Act applies only to "direct insurance." N.J.S.A. 17:30A-2b. Thus, by its terms, it does not apply to reinsurance. We reject plaintiffs' argument that PLIGA coverage is available because ROA stands in the shoes of ANLIR, the direct insurer, and therefore as in Venetsanos, ROA is directly responsible for claims against the direct insurer. It may be that, if plaintiffs can prove a sufficient degree of control they might be able to recover directly from the liquidation estate of ROA. That circumstance, however, does not provide a basis for PLIGA recovery through an insurer (ROA) that did not issue the policies in question. See N.J.S.A. 17:30A-5.
Affirmed.
NOTES
[1] This and other sections of the PLIGA Act were amended by L. 2004, c. 175, effective December 22, 2004, but these amendments do not affect our analysis.